UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------X
GRAND RIVER ENTERPRISES SIX NATIONS,  :
LTD., JASH INTERNATIONAL, INC.,       :
INTERNATIONAL TOBACCO PARTNERS, LTD., :
NATIONWIDE TOBACCO, INC., SUN TOBACCO,:
INC., and 3B HOLDINGS, INC.,          :   02 Civ. 5068(JFK)
                                      :   **OPINION and ORDER**
                 Plaintiffs,          :
                                      :
          – against –                 :
                                      :
WILLIAM PRYOR, et al.                 :
                                      :
                 Defendants.          :
------------------------------------X

**APPEARANCES**


    **For Plaintiff Grand River Enterprises Six Nations, Ltd.**

        Law Offices of Leonard Violi, LLC
        910 East Boston Post Road
        Mamaroneck, New York 10543
          Of Counsel:  Leonard Violi, Esq.

        Windels Marx Lane & Mittendorf, LLP
        156 West 56th Street
        New York, New York 10019
          Of Counsel:  Robert J. Luddy, Esq.
                       Stephen DeHoff, Esq.


    **For Defendants (as Liaison Counsel)**

        Eliot Spitzer
        Attorney General of the State of New York
        120 Broadway
        New York, New York 10271
          Of Counsel:  Avi Schick, Esq.
                       Dana Biberman, Esq.

**JOHN F. KEENAN, United States District Judge**

**JOHN F. KEENAN, United States District Judge:**

## INTRODUCTION

Plaintiff Grand River Enterprises Six Nations, Ltd. ("Grand River") moves for a preliminary injunction barring defendants from (1) enforcing their states' so-called "Allocable Share Statutes," (2) denying Grand River's application to become a party to the Master Settlement Agreement ("MSA") between the states and certain participating cigarette manufacturers, and (3) banning sales in their states of Grand River-produced cigarettes.

On April 13, 2006, Grand River moved by <u>ex parte</u> order to show cause for a temporary restraining order pending a hearing on the instant motion. After a hearing that day, the Court declined to issue the restraining order. The Court heard the oral arguments of counsel on April 21, 2006 and witness testimony on April 25, 26 and May 1, 2006. The parties submitted proposed findings on May 12, 2006. For the reasons that follow, Grand River's motion is denied in its entirety.

## FINDINGS OF FACT

### A.   Witnesses

The testifying witnesses were Messrs. Larry Phillips, Marvin Wesley and Jerry Montour. Mr. Phillips is the president of Tobaccoville, USA, Inc. ("Tobaccoville"), located in South

Carolina. (Tr. 2; Philips Decl.)[1] Tobaccoville imports cigarettes from Grand River. (Tr. 3.) Mr. Wesley is an independent sales representative for Tobaccoville whose territory includes Kansas and about one-third of Oklahoma. (Tr. 84, 96-97.) Mr. Montour, a member of the Mohawk tribe, is the CEO of Grand River. He has residences on the Tamarac Reservation and in the city of South Hamilton, both of which are located in the Province of Ontario, Canada. (Tr. 113.)

B.  **Background**

   1.   **The Master Settlement Agreement**

         In November 1998, the attorneys general of 46 states, the District of Columbia, the Commonwealth of Puerto Rico and four territories (the "Settling States") entered into a Master Settlement Agreement ("MSA") with the four largest domestic cigarette manufacturers. These manufacturers, known as Original Participating Manufacturers ("OPMs") promised to, <u>inter</u> <u>alia</u>: (1) make per-cigarette payments in perpetuity, (2) fund a national foundation devoted to educating the public about the dangers of tobacco use and (3) adhere to restrictions on their advertising, marketing and other practices. In return, the Settling States released certain past, present and future claims against the OPMs. Other cigarette manufacturers may join the MSA as

_____

[1] "Tr." refers to the transcript of the hearing that took place on April 25, 26, and May 1, 2006.

Subsequent Participating Manufacturers ("SPMs").  SPMs also must make annual per-cigarette payments to the Settling States and adhere to the same advertising, marketing, and other restrictions as the OPMs.  (MSA §§ II, III, VI, IX.)[2]

Companies that do not participate in the MSA are called Non-Participating Manufacturers ("NPMs"). (MSA § II.)  The MSA, however, contains provisions that give the Settling States incentives to enact "Escrow Statutes" directed at NPMs (MSA § VIII(d)(2), Ex. T.)  A typical Escrow Statute, inter alia, requires each NPM whose cigarettes are sold in that state to deposit a statutory per-cigarette amount into an escrow account established by the NPM.  See, e.g., N.Y. Pub. Health Law § 1399-pp(2)(a) (McKinney's Supp. 2005).  The NPM retains title to the funds and keeps all interest as earned.  Id. § 1399-pp(2)(b).

## 2.   Release of Escrow Funds

All of the Settling States have enacted Escrow Statutes. (Hering Decl. ¶ 17.)  Funds remain in escrow for 25 years, at which point they are released and revert to the NPM. N.Y. Pub. Health Law § 1399-pp(2)(b)(iii).  The primary purpose of the escrow requirement is to create a resource available to the States in the event they sue and obtain a judgment or settlement against an NPM for damages arising out the NPM's

_____

[2] The MSA appears at Exhibit 5-A of Leonard Violi's Emergency Declaration in Support of the Order to Show Cause.

4

cigarette sales in the state.  See N.Y. Pub. Health Law § 1399-nn(4) (McKinney's 2002).  Accordingly, the Escrow Statutes permit an early release of escrowed funds for satisfaction of such judgments or settlements.  Id. § 1399-pp(2)(b)(i) (McKinney's Supp. 2005).  As originally enacted, the Escrow Statutes permitted an early release in one other situation.  Under the so-called "Allocable Share Provision," an NPM was entitled to an early release of funds to the extent that its escrow payments for a given year exceeded the State's Allocable Share of the payments that the NPM would have made under the MSA, had the NPM been an SPM.  Id. § 1399-pp(2)(b)(ii) (McKinney's 2002).[3]  Certain NPMs exploited the Allocable Share Provision by concentrating their sales in a small number of states.  The result was the release of almost all of their escrowed funds. (Hering Decl. ¶ 13.)  Grand River employed this business strategy. (Violi Emerg. Decl. ¶ 10.)

Not all cigarettes sold within Settling States trigger an escrow obligation.  For example, most cigarettes sold on Native American reservations are exempt from escrow payments.  Escrow Statutes require payments on "units sold."  "Units sold" in a given state are measured by the number of cigarettes in

_____

[3] Under the MSA, for each cigarette sold anywhere in the United States, the OPMs and SPMs pay the MSA Escrow Agent.  The payment is then allocated among the Settling States according to an "Allocable Share" formula in the MSA.  For example, New York's allocable share is 12.760310% (one of the largest); Vermont's is 0.4111851% (one of the smallest). (MSA, Ex. A.)

packs bearing a state excise tax stamp. <u>See, e.g.,</u> N.Y. Pub.
Health Law § 1399-oo(10). On Native American reservations, packs
typically are sold without state excise tax stamps. (Tr. 257.)

### 3. The Allocable Share Amendment

All of the Settling States (except Missouri) reacted to
the large escrow releases by amending their Allocable Share
Provisions. (Hering Decl. ¶ 17.) The new "Allocable Share
Amendment" entitles the NPM to a release of escrow funds only to
the extent that its escrow payments in a given state exceed what
the NPM would have owed to <u>all</u> states under the MSA, if the NPM
had been an SPM. <u>See, e.g.,</u> N.Y. Pub. Health Law § 1399-
pp(2)(b)(ii) (McKinney's Supp. 2005). An NPM's escrow obligation
now is calculated solely by reference to sales within a Settling
State, with no consideration given to the State's Allocable
Share. (Tr. 253.) Under the new law, NPMs will not receive large
escrow refunds even if they concentrate their sales in a small
number of States. (Williams Decl. ¶ 14-15.)

The failure to make escrow payments is punishable
pursuant to a State's "Certification Statute." All of the
Settling States whose attorneys general are parties to this
action have enacted a Certification Statute. (Hering Decl. ¶ 20.)
In New York, for example, an NPM must certify annually that it is
in compliance with the Escrow Statute. If the NPM does not so
certify, it must make the payment within fifteen days. Failure

to do so could result in court-imposed civil penalties of a certain percentage of the shortfall.  After subsequent knowing violations, the court may ban the manufacturer from selling cigarettes in the state for up to two years.  See N.Y. Pub. Health Law § 1399-pp(2)(c).

Under newly enacted "Contraband Statutes," the State tax commissioner has authority to impose a civil penalty of up to $5000 against an NPM that violates the Escrow Statute.  See N.Y. Tax Law. §§ 480-b(2); 481(c).  If the commissioner finds the NPM in violation of the Escrow Statute, he may prevent the NPM's cigarettes from obtaining a state cigarette tax stamp.  Id. § 480-b(2).  He also may seek to suspend or cancel any license issued to an NPM.  Id. § 481-c.  Grand River contends that the Contraband Statutes give the attorneys general unilateral authority to ban sales of cigarettes in their States without recourse to the courts. (Grand River Prop. Finding of Fact # 16.)

## C.  **Grand River**

### 1.  **Sales**

Grand River is a Canadian-incorporated NPM.  It is owned by First Nations members of the Iroquois Confederacy. (Williams Decl. ¶ 2.)  Grand River's principal place of business is on the Six Nations Reservation in Oshweken, Ontario. (Tr. 116.)  Grand River manufactures cigarettes for sale in Canada, the United States and other countries including Germany, Denmark,

Switzerland, Sweden, Vietnam and some African nations. (Tr. 197-98).  Grand River currently is the fourth largest cigarette manufacturer in Canada. (Tr. 195.)

Grand River sells cigarettes to two companies for distribution in the United States: Native Wholesale Supply Company ("Native") and Tobaccoville (Tr. 196.)  Native sells Grand River cigarettes exclusively on Native American reservations in the United States. (Tr. 197.)  As stated, Grand River incurs no escrow obligation from these sales. (Tr. 257.)  In 2005, Grand River sold approximately 1.6 billion cigarettes to Native. (Tr. 196-97.)  Tobaccoville sells the rest of Grand River's cigarettes in seven Settling States: North Carolina, South Carolina, Georgia, Tennessee, Oklahoma, Arkansas and Kansas. (Tr. 56.)  These sales totaled 3.6 billion cigarettes in 2005, nearly a fifty-fold increase over American sales in 1999. (Tr. 194.)  Grand River and Tobaccoville have chosen not to sell cigarettes in most of the Settling States, and in the four non-MSA states. (Tr. 56-59.)[4]

## 2.    Shareholder Bonuses

In 2003, Grand River paid $23,626,000 Canadian Dollars ("CAD") in management bonuses to its seven or eight shareholders. (Pl. Ex. 10 at 4.)  Of that amount, the shareholders loaned

_____

[4] Florida, Minnesota, Mississippi and Texas settled independently with the major tobacco manufacturers and are not signatories to the MSA.

$15,554,815 CAD back to the company. (Tr. 233.)  In so doing, the shareholders converted income to liability and obtained a favorable tax consequence. (Williams Reply Decl. ¶ 3; Tr. 163.) The shareholders retained approximately $8.1 million CAD for personal use. (Pl. Ex. 10 at 5.)  Grand River paid $607,068 CAD in management fees to non-shareholder employees, none of which was loaned back to the company. (Pl. Ex. 10 at 4; Tr. 184, 241.)

In 2004, Grand River paid $23,266,268 CAD in bonuses to its shareholders, of which approximately $17.4 million CAD was loaned back to the company and $5.8 million CAD was retained for personal use. (Pl. Ex. 10 at 4-5.)  Grand River paid $1,280,326 CAD in management fees to non-shareholder employees, none of which was loaned back to the company. (Pl. Ex. 10 at 4; Tr. 239.) In 2005, Grand River paid at least $18,000,000 CAD in bonuses to its shareholders.  The shareholders loaned back to the company approximately $10 million CAD and retained approximately $8 million CAD. (Tr. 242.)

In addition to paying shareholder bonuses, Grand River made charitable donations of more than $2,000,000 CAD in 2004. (Pl Ex. 10 at 4; Tr. 171.)  During 2005, Grand River contributed more than $3,000,000 to charity. (Tr. 243-44.)

### 3.  Grand River's Pricing and Escrow Obligations

In April 2006, Grand River made escrow deposits for 2005 sales.  Nearly 90% of the deposits in North Carolina and

South Carolina were subject to immediate release because the Allocable Share Provision was still in effect in those States. (Tr. 81.) Tobaccoville has built into its current pricing the escrow obligation for cigarette sales during 2006. Escrow for 2006 sales in North and South Carolina will be calculated under the new law and will be due in April 2007. (Tr. 81.) Grand River's post-Allocable Share Amendment escrow obligation stands at around $4.29 per carton, roughly a 50% increase from the bygone days of large Escrow releases. (Tr. 25; Hering Decl. ¶ 10; Williams Decl. ¶ 14.)

Mr. Phillips testified that the new law prevents Grand River from competing with SPMs. The wholesaler's cost of Grand River's Seneca brand, distributed by Tobaccoville, is $10.94 per carton, without profit. (Tr. 26.) In eastern Tennessee, one of Grand River's markets, General Tobacco, Inc. (an SPM) charges a wholesale price of $8.95 per carton. (Tr. 26-27.) Premier, another SPM, charges $8.50 per carton wholesale. (Tr. 28.) Mr. Phillips testified that Tobaccoville cannot compete with those prices. (Tr. 29.) The evidence shows, however, that other cigarette brands selling in that region, such as Bronco, GT One (both General Tobacco products), Sonoma, and Kentucky's Best all have higher wholesale prices than Seneca. (Pl. Ex. 5; Tr. 29.) SPMs manufacture all of them. (Pl. Ex. 5.) In response to questioning by the Court, Mr. Phillips admitted that some

participating members in the MSA have higher wholesaler's costs
than Grand River and Tobaccoville. (Tr. 30.)  He also conceded
that some SPM brands have higher retail costs and customer costs
than Grand River's brand. (Tr. 31-33.)

Mr. Phillips testified that in the first quarter of
2005, before the amendment, Tobaccoville sold over 500,000
cartons of Grand River cigarettes to South Carolina wholesalers
at $8.05 per carton.  In the first quarter of 2006, Tobaccoville
sold only 6,600 cartons to one South Carolina wholesaler (Piggy-
Wiggly) at $12.05 per carton. (Tr. 302, 307.)  This wholesaler
has recently informed Mr. Phillips that Grand River's brand would
be discontinued and replaced with an SPM's cigarettes. (Tr. 308-
09.)

### 4. Conspiracy Theories

Grand River contends that the Settling States enacted
the Allocable Share Amendments at the behest of OPMs and SPMs in
order to limit NPM sales. (DeHoff Aff., Ex. 1.)  Grand River
alleges that the MSA's participating manufacturers played a key
role in drafting the Allocable Share Amendments, and that the
Settling States made sure that they had the manufacturers'
"blessing" before the legislation could be considered safe for
enactment. (Violi Reply Decl., Ex. 12-14.)  However, the NPMs had
access to the process as well.  Mr. Phillips of Tobaccoville
testified that he met with a state official from South Carolina

11

concerning that State's Allocable Share Amendment. (Tr. 21.)  He
tried without success to get the Amendment changed, but he and
others were able to persuade the State to move back the effective
date of the Amendment from the middle of 2005 to January 1, 2006.
(Tr. 21-22.)

### 5.    Litigation Between Grand River and the States

On July 1, 2002, Grand River filed a complaint against
thirty-one state attorneys general.  The complaint alleges, _inter_
_alia_, that the Escrow Statutes and other legislation adopted by
the Settling States violate the Commerce Clause, U.S. Const. Art.
I, Sec. 8, cl. 3, and the Sherman Act, 15 U.S.C. § 1.  The
defendant attorneys general have brought separate lawsuits in
their own fora against Grand River for failure to make escrow
payments. (Williams Decl., Ex. 6.)  Some of the attorneys general
have obtained default judgments. (Violi Decl. in Further Supp.
Ex. 4.)  In nine states, Grand River has resolved, without
prejudice, escrow compliance demands and lawsuits.  These states
are Arkansas, Georgia, Kansas, Louisiana, Nebraska, North
Carolina, Oklahoma, South Carolina, and Tennessee. (Williams
Decl. ¶ 11-12.)  At present, Tobaccoville sells Grand River's
cigarettes in seven of these nine states, Louisiana and Nebraska
being the exceptions. (Tr. 67.)  Arkansas and Oklahoma are not
parties to this action.  In other words, Tobaccoville sells Grand

River cigarettes in five Settling States, and Grand River admits
to having resolved escrow disputes with all five of them.

If Grand River meets its new escrow obligations going
forward, it can become fully escrow compliant in every Settling
State by paying $10,000,000 in 2005 escrow liability for Arkansas
and Oklahoma, $6,000,000 in back payments for pre-2005 sales, and
penalties for late payment. (Tr. 250-51.)

### 6. Grand River's MSA Application

If Grand River wished to join the MSA as a SPM, the
company would owe back payments of approximately $204 million.
(Tr. 251.)  This obligation would include approximately
$77,000,000 for cigarettes sold by Native on U.S. Native American
reservations prior to 2005. (Tr. 256-57; see supra, p. 8.)  For
its 2005 sales of 1.6 billion cigarettes on Native American
reservations, Grand River would be required to pay over
$20,000,000 in MSA payments. (Tr. 257-58.)  These sales would not
result in an escrow liability if Grand River were to remain an
NPM. (Tr. 257-58.)  Even though Native's sales on the
reservations represent more than one-third of Grand River's 2005
U.S. sales, Mr. Montour testified that if Grand River were to
become an SPM, it would give up its sales to Native. (Tr. 258.)

On April 3, 2006, Grand River submitted a formal
application to the National Association of Attorneys General
("NAAG") seeking admission to the MSA as an SPM. (Williams Decl.,

Ex. 6.)  Despite this application, Mr. Montour testified that Grand River will continue to litigate to have the MSA declared illegal. (Tr. 294.)  Grand River also balks at NAAG's requirement that back escrow from 1999-2005 be paid in full.  Grand River claims that it is not the statutorily-defined "tobacco product manufacturer" of certain cigarettes it has produced for U.S. sales and that it should not owe these escrow payments. (Williams Decl. ¶ 10.)  In addition to back escrow, Grand River contends that it will be responsible for at least $16 million in penalties for late payments. (Violi Decl. in Further Supp. ¶ 16.)

When NAAG did not respond to Grand River's application for MSA admission by April 13, 2006 (only 10 days after formal filing), Grand River brought on the instant motion by order to show cause.

## CONCLUSIONS OF LAW

The preliminary injunction "is one of the most drastic tools in the arsenal of judicial remedies." Hanson Trust PLC v. SCM Corp., 774 F.2d 47, 60 (2d Cir. 1985).  In order to obtain this extraordinary relief, the applicant must establish "(1) the likelihood of irreparable injury in the absence of such an injunction, and (2) either (a) likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation plus a balance of hardships tipping decidedly in [applicant's] favor." Malletier

14

v. Burlington Coat Factory Warehouse Corp., 426 F.3d 532, 537 (2d
Cir. 2005) (internal quotation marks omitted).  Where, as here,
"a preliminary injunction is sought against Government action
taken in the public interest pursuant to a statutory or
regulatory scheme, the less-demanding 'fair ground for
litigation' standard is inapplicable, and therefore a 'likelihood
of success' must be shown."  Forest City Daly Housing, Inc. v.
Town of North Hempstead, 175 F.3d 144, 149 (2d Cir. 1999).

## A.    Likelihood of Irreparable Injury

### 1.    The Allocable Share Amendments

Grand River asks the Court to enjoin the States'
Allocable Share Amendments.  The Court is unsure why Grand River
seeks to enjoin all of the Settling States from enforcing their
Amendments.  Grand River does not sell cigarettes in all of these
States.  Grand River is non-compliant under the new law only in
Arkansas and Oklahoma.  Neither of those States is a party to
this action.  Grand River admits to having resolved escrow
demands from the other States, and the new law did not even apply
to 2005 escrow payments in North Carolina and South Carolina.

Mr. Phillips's testimony suggested that Grand River
will be able to compete with some SPMs, but not with others.  And
even if Grand River loses some competitive ground in the Settling
States, it still sells cigarettes to Canada, Europe, Africa,
Asia, and on Native American reservations.  None of these sales

incur escrow obligations.  In the Court's view, the evidence is inconclusive on the question of whether Grand River is likely to be irreparably harmed by their new escrow obligations.

The Court is aware that Judge Hellerstein of this district enjoined the operation of the Allocable Share Amendment because of the competitive damage to NPMs <u>vis-a-vis</u> SPMs in local markets.  <u>See</u> <u>Freedom Holdings, Inc. v. Spitzer</u>, No. 02 Civ. 2939(AKH), 2004 WL 2035334, at *30-31 (S.D.N.Y. Sept. 14, 2004). The evidence in the instant case does not compel the same result. Enforcement of the escrow requirements in the Allocable Share Amendment does not deprive Grand River of its ability to compete effectively in the market.  Most importantly, no convincing evidence was presented that compliance with the Allocable Share Amendment will drive Grand River out of business.  <u>See</u> 43A <u>Corpus Juris Secundum</u> § 62 (2005).  True, if the company wishes to strengthen its competitive position by reaching out to more Settling States, it will have to pay its back escrow of at least $16,000,000 USD.  This is a substantial sum, but comparable to the $22,000,000 CAD in bonuses that Grand River's shareholders have taken out of the company between 2003 (when the first Allocable Share Amendments were enacted) and 2005.

Accordingly, the Court is not convinced that Grand River is likely to suffer irreparable damage absent an injunction of the Allocable Share Amendment.

## 2. Grand River's MSA Application

If the Court declines to enjoin the Allocable Share Amendment, Grand River seeks an injunction that would prevent NAAG from denying Grand River's MSA application. In spite of Grand River's best arguments, this is at bottom an request for a mandatory injunction. Grand River did not file the application formally with NAAG until April 3, 2006, the proverbial last minute. In its motion papers, Grand River informed the Court that it considered NAAG's failure to respond by April 13, 2006 as a denial of the application. Grand River's stance smacks of pretext. Ten days is not enough time for NAAG to consider an application to join the MSA, let alone one involving an applicant litigating to have the MSA declared illegal. More importantly, the evidence at the hearing was overwhelming that it will cost Grand River far more to join the MSA ($204 million) than to become an escrow-compliant NPM ($16 million plus penalties).

Grand River's position violates Section XVIII(l) of the MSA, which requires MSA participants to agree that they will "not directly or indirectly assist or encourage any challenge to this Agreement or any Consent Decree by any other person, and will support the integrity and enforcement of the terms of this Agreement and Consent Decrees." It is perhaps worth noting that Grand River does not even mention this issue in its complaint. Based on the foregoing, there is no basis for this Court to order

thirty-one States' Attorneys General to enter into a settlement with an NPM that is attacking the settlement agreement in the courts. Not surprisingly, NAAG informed Grand River by letter dated May 19, 2006, that its MSA application is deficient because of its noncompliance with the Escrow Statutes and with Section XVIII(l). NAAG welcomes Grand River to apply again when it comes into compliance. There is no likelihood of irreparable harm arising out of this denial of Grand River's MSA application.

### 3. Blacklisting of Grand River Cigarettes

Grand River's final application is for an injunction preventing the States from "taking any adverse action against Grand River or the cigarettes it produces by reason of, or arising from, such denial." (G.R. Reply Mem. at 4.) This application presumably is directed at the Certification and Contraband Statutes, which give teeth to the Escrow Statutes. These statutes permit the States to penalize non-compliant NPMs, even to the point of banning sales of their cigarettes, as discussed supra, pp. 6-7. Both Mr. Montour of Grand River and Mr. Phillips of Tobaccoville testified credibly as to the dire consequences of even a short ban on the sale of cigarettes in a State. (Tr. 23, 176.) But even assuming arguendo, as Grand River contends, that state officials have unilateral authority under the Contraband Statutes to ban cigarettes without a court order, none of the evidence demonstrates any likelihood that Grand River

18

faces blacklisting in the Settling States in which Tobaccoville sells cigarettes.  As discussed in the previous section, Grand River has resolved escrow demands from the five Settling States in which Tobaccoville sells cigarettes, and which are parties to this action.

### 4.    The Public Interest

In deciding whether injunctive relief is appropriate in this instance, the Court also must "give some consideration to the balance of [public] interests.... Otherwise a claim that appears meritorious at a preliminary stage but is ultimately determined to be unsuccessful will have precipitated court action that might needlessly have injured the public interest." Time Warner Cable v. Bloomberg L.P., 118 F.3d 917, 929 (2d Cir. 1997). The evidence at the hearing showed that the likelihood of irreparable harm to Grand River from enforcement of the statutes is speculative at best.  On the other hand, the NPMs' escrow accounts play an important role in deflecting the burden of smoking-related health care costs from the States to the cigarette manufacturers.  If the States cannot enforce their Escrow Statutes, the public interest suffers because there will be fewer monies in escrow for settlements and judgments against tobacco manufacturers.  Thus, the harm to defendants, and the public interest, if an injunction is issued outweighs the potential harm to Grand River absent an injunction.

**B.    Likelihood of Success on the Merits**

Even if Grand River had been able to satisfy the "irreparable harm" prong, it cannot demonstrate a likelihood of success on the merits of its claims.  The Court reiterates that it is not enough in this case for Grand River to show serious questions going to the merits.  The higher standard "reflects the idea that governmental policies implemented through legislation or regulations developed through presumptively reasoned democratic processes are entitled to a higher degree of deference and should not be enjoined lightly."  Able v. United States, 44 F.3d 128, 131 (2d Cir. 1995).

Grand River asserts antitrust and Commerce Clause claims in its complaint.  A recent decision by Chief Judge Jimm Larry Hendren of the United States District Court for the Western District of Arkansas may well bar Grand River's claims in this action under the doctrine of issue preclusion.  See Grand River Enterprises Six Nations, Ltd. v. Beebe, 418 F. Supp. 2d 1082 (W.D. Ark. 2006).  Even if issue preclusion does not apply, however, the Court finds that Grand River cannot establish a likelihood of success on the merits with respect to either claim.

**1.    Antitrust Claim**

In order to establish a likelihood of success on its antitrust claim, Grand River must establish a per se Sherman Act violation.  The Sherman Act will pre-empt a state statute "only

if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982). Even if a per se violation is established, there may be immunity under Parker v. Brown, 317 U.S. 341 (1943) if the restraint is "clearly articulated and affirmatively expressed as state policy" and the policy is "actively supervised" by the state. Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980).

Under the Allocable Share Amendment, Grand River calculates its escrow obligations solely by reference to sales within a particular state. The Court is not convinced by Grand River's contention that because the escrow obligation is a national-market-share-dependent amount that is tied to nationwide sales, it forces competitors to raise prices by a uniform, minimum amount in every State. Each NPM or SPM must make its own unilateral decision with respect to price and output, and no state agent has the power to dictate the prices or outputs of any cigarette manufacturer. Thus, Grand River has not established a likelihood of success under the Rice per se test.

Nor has Grand River convinced the Court that the Escrow Statutes form a "hybrid" restraint on trade, i.e., "[w]here private actors are ... granted a degree of private regulatory

power." 324 Liquor Corp. v. Duffy, 479 U.S. 335, 345-46 n.8
(1987) (internal quotation marks ommited). The MSA does not give
OPMs or SPMs any power with respect to the output or prices of
their competitors. The MSA does not create disincentives for
OPMs, SPMs or NPMs to restrict output or to avoid reducing
prices. Finally, there is no evidence to show that the Escrow
Statutes enforce or implement OPMs' or SPMs' private market
decisions made pursuant to the MSA.

In light of the foregoing, the Court concludes that
Grand River has not established a per se violation under Rice and
thus fails to show a likelihood of success on the merits of its
antitrust claim. It is not necessary to assess Parker immunity.

**2. Commerce Clause**

It is well settled that the Commerce Clause operates as
"an authorization for congressional action" and "even in the
absence of a conflicting federal statute, as a restriction on
permissible state regulation." Hughes v. Oklahoma, 441 U.S. 322,
326 (1979). This case involves the latter manifestation of the
Clause, called the "dormant" Commerce Clause. After the Second
Circuit's decision in Grand River Enterprises Six Nations, Ltd.
v. Pryor, 425 F.3d 158 (2d Cir. 2005), the only surviving basis
for Grand River's dormant Commerce Clause challenge to the Escrow
Statute centers around whether the statute "has the practical
effect of extraterritorial control on commerce occurring entirely

outside the boundaries of the state in question." Id. at 168

(quoting Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205, 216 (2d

Cir. 2004)).  While expressing no view on the merits of the

claim, the Circuit held that Grand River cleared the Rule

12(b)(6) hurdle by alleging that "the practical effect of the

challenged statutes and the MSA is to control prices outside of

the enacting states by tying both the SPM settlement and NPM

escrow payments to national market share, which in turn affects

interstate pricing decisions."  See Grand River, 425 F.3d at 173.

Even if, as the Circuit recognized, the amount of an

escrow refund "is, in part, keyed to the amount an NPM would have

paid if it had joined the MSA as an SPM –– a national-market-

share-dependent amount," id. at 172, Grand River has not shown

that this scheme may result in interstate price control.  The

only authority that Grand River cites in its proposed conclusions

of law to support this argument is Healy v. Beer Institute, Inc.,

491 U.S. 324 (1989).  In Healy, the Supreme Court found a

Commerce Clause defect in a Connecticut statute requiring that

"out-of-state shippers affirm under oath at the time of posting

that their posted prices were and would remain no higher than the

lowest prices they would charge for each beer product in the

border States during the effective period."  Id. at 327 (citing

Conn. Gen. Stat. Ann. §30-63b(b)).  The Escrow Statute is

entirely distinguishable.  It neither makes cigarette prices or

escrow payments in a particular State dependent on prices or escrow payments in other States, nor does it have any effect on price or escrow payments by NPMs in other states.

While Grand River's allegations of a "national-market-share-dependent formula," standing alone, may be enough to survive a Rule 12(b)(6) motion, they do not establish a likelihood of success on the merits of the Commerce Clause claim.

### 3. Grand River's MSA Application

The issue of Grand River's application to join the MSA as an SPM is not raised in the complaint. Given Grand River's litigation stance, there are serious factual and legal questions as to the merits of Grand River's application. In absence of a claim in the complaint, these questions are for NAAG and the Settling States, not the Court.

## CONCLUSION

Grand River has shown neither a likelihood of irreparable injury absent an injunction nor a likelihood of success on the merits of its claims. Accordingly, Grand River's motion for a preliminary injunction is denied.

**SO ORDERED.**

Dated: New York, New York
May 3l, 2006

JOHN F. KEENAN
**United States District Judge**

24