UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
GRAND RIVER ENTERPRISES SIX      :
NATIONS, LTD.,                   :
                                 :
             Plaintiff,          :
                                 :
      -against-                  :
                                 :
TROY KING et al.,                :
                                 :
             Defendants.         :
-----------------------------X

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:_ 3-17-11 _____
```

No. 02 Civ. 5068 (JFK)
**Opinion and Order**

APPEARANCES:

    For Plaintiff:
        Leonard Violi, Esq.

        Robert Luddy, Esq.
        WINDELS MARX LANE & MITTENDORF, LLP

        Marvin Lange, Esq.
        Marc Mukasey, Esq.
        BRACEWELL & GIULIANI, LLP

    Liaison Counsel for Defendants:
        Office of the Attorney General of the State New York
            Of Counsel:  Christopher Leung, Esq.

        New York City Law Department, Office of the
        Corporation Counsel
            Of Counsel:  Dana Biberman, Esq.

 **JOHN F. KEENAN, United States District Judge:**

    Plaintiff Grand River Enterprises Six Nations, Ltd. ("Grand

River" or "Plaintiff") brings this action against the Attorneys

General of Alabama, Alaska, Arizona, California, Colorado,

Delaware, Georgia, Idaho, Illinois, Indiana, Iowa, Kansas,

Louisiana, Maine, Maryland, Massachusetts, Michigan, Missouri,

Montana, Nebraska, New York, North Carolina, Ohio, Oregon, South

Carolina, South Dakota, Tennessee, Washington, Wisconsin, and Wyoming (collectively, the "States" or "Defendants") asserting Commerce Clause and Sherman Act violations stemming from each state's participation in a tobacco Master Settlement Agreement ("MSA").  Before the Court are Defendants' motions to exclude the expert reports of Drs. Eisenstadt and Bulow as well as cross motions for summary judgment.

**I.    Background**

The following facts are undisputed unless otherwise noted.[1]

**A.    Overview of the MSA**

In November 1998, the nation's four largest cigarette manufacturers entered into an agreement with forty-six states[2] and certain other jurisdictions (the "Settling States") settling pending and future claims in exchange for annual payments by the cigarette companies to compensate the states for health care costs associated with the treatment of tobacco-related illnesses.  This agreement is embodied in the MSA.  The four major tobacco companies who initially negotiated and signed onto the MSA are known as the original participating manufacturers ("OPMs").  Other tobacco manufacturers may elect to participate in the MSA at any time and be released from liability for any

---

[1] To the extent any information filed under seal is discussed in this Opinion, that information is hereby unsealed in light of the strong presumption of public access.

[2] Florida, Minnesota, Mississippi, and Texas settled with these manufacturers prior to the consummation of the MSA.

claims the Settling States could bring in exchange for specified settlement payments; these are known as subsequent participating manufacturers ("SPMs"). To encourage early participation, the MSA created special incentives for any manufacturer that signed on within sixty (later changed to ninety) days of its execution; this subset of manufacturers is known as the "grandfathered SPMs." Some manufacturers continue to sell cigarettes in the United States without joining the MSA; these are referred to as non-participating manufacturers ("NPMs"). Each Settling State receives a stipulated portion or "allocable share" of annual MSA payments. For example, New York receives 12.76% of total OPM, SPM, and grandfathered SPM MSA payments each year. (MSA Ex. A).

The MSA defines settlement payments for each group of tobacco manufacturers that participate in the MSA. With respect to OPMs, the MSA sets forth base amounts these companies collectively are required to pay to the Settling States each year. For example, in 2011, the base payment for OPMs is $8.139 billion. (MSA § IX(c)(1)). Each OPM pays a proportion of the base amount equal to its relative market share of the total number of cigarettes shipped by the OPMs in or to the fifty states, the District of Columbia, and Puerto Rico during the preceding year. (Id.; MSA § II(mm)). These base payments are subject to certain adjustments, including: (1) an upward adjustment for inflation (MSA § IX(c)(1); Ex. C); (2) a "volume

3

adjustment" that reduces the base payment if the total number of cigarettes shipped in or to the U.S. market drops below a specified level (MSA § IX(c)(1); Ex. E); and (3) a downward "NPM Adjustment" that generally reduces the base payment by three times the amount of any market share OPMs lost to NPMs in a preceding year.  (MSA § IX(d)).[3]

SPMs pay a percentage of OPM base payments depending in part on their relative market shares.  (MSA § IX(i)).  SPM payments are also subject to the inflation adjustment and the NPM Adjustment.  (MSA § IX(i)(3)).  However, grandfathered SPMs are permitted to exempt a certain number of cigarettes from their payment obligations.  This "grandfathered share" is equal to the greater of 125% of an SPM's 1997 market share of total U.S. cigarette sales or 100% of its 1998 market share of total U.S. cigarette sales.  (MSA § IX(i)(1)).  Thus, grandfathered SPMs only make MSA payments on cigarettes sold in excess of their grandfathered share.

---

[3] The NPM Adjustment only comes into play if:  (1) an economic consulting firm determines that disadvantages experienced as a result of the MSA were a "significant factor contributing to the Market Share Loss" (MSA § IX(d)(1)(C)); and (2) the Settling State receiving MSA payments has not passed or enforced an Escrow Statute.  (MSA § IX(d)(2)).  "An arbitrator has found that disadvantages in the MSA were a significant factor in the increase in NPM Market Share for the years 2003-2005, but to date no State has been found to lack a qualifying statute or to have failed to diligently enforced its qualifying statute." (Gruber Rep. ¶ 4).

## B.   Escrow and Contraband Statutes

Since NPMs do not make MSA payments, there was a concern that they could use this advantage to gain market share from OPMs and SPMs, in turn imposing unreimbursed healthcare costs on the Settling States.  The MSA's solution to this problem came in the form of Escrow Statutes, with model legislation included at Exhibit T to the agreement.  The Escrow Statutes aim to "effectively and fully neutralize[] the cost disadvantages that the Participating Manufacturers experience vis-à-vis Non-Participating Manufacturers within such Settling State as a result of the provisions of this Agreement," (MSA § IX(d)(2)(E)), by requiring NPMs that sell cigarettes in-state either to:  (1) join the MSA and make settlement payments; or (2) pay a specified amount per cigarette sold in-state into an escrow fund used to satisfy any judgment the Settling State should win against the NPM.  All of the Defendant States, along with all other Settling States, have enacted substantially similar Escrow Statutes.  See Ala. Code § 6-12-3; Alaska Stat. § 45.53.020; Ariz. Rev. Stat. Ann. § 44-7101; Cal. Health & Safety Code § 104557; Colo. Rev. Stat. Ann. § 39-28-203; Del. Code Ann. tit. 29, § 6082; Ga. Code Ann. § 10-13-3; Idaho Code Ann. § 39-7803; 30 Ill. Comp. Stat. 168/15; Ind. Code § 24-3-3-12; Iowa Code § 453C.2; Kan. Stat. Ann. § 50-6a03; La. Rev. Stat. Ann. § 13:5063; Me. Rev. Stat. Ann. tit. 22, § 1580-I; Md. Code Ann.

Bus. Reg. § 16-403; Mass. Gen. Laws Ann. ch. 94E, § 2; Mich. Comp. Laws § 445.2052; Mo. Ann. Stat. § 196.1003; Mont. Code Ann. § 16-11-403; Neb. Rev. Stat. § 69-2703; N.Y. Pub. Health Law § 1399-pp; N.C. Gen. Stat. § 66-291; Ohio Rev. Code Ann. § 1346.02; Or. Rev. Stat. § 323.806; S.C. Code Ann. § 11-47-30; S.D. Codified Laws § 10-50B-7; Tenn. Code Ann. § 47-31-103; Wash. Rev. Code Ann. § 70.157.020; Wis. Stat. § 995.10; Wyo. Stat. Ann. § 9-4-1202.  The NPM retains ownership of and earns interest on the funds while they are held in escrow, a period generally lasting twenty-five years.

As originally enacted, the Escrow Statutes included an "allocable share release" provision through which an NPM could secure release of any escrow funds in excess of "the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement . . . had it been a participating manufacturer."  (Model Escrow Statute, MSA Ex. T-4).  In other words, an NPM could recoup any escrow funds that exceeded the amount the Settling State would have received in MSA payments had the NPM been an SPM.  This loophole allowed an NPM that concentrated its sales in a single state or small number of states to obtain release of most of its escrow deposits. Therefore, beginning in 2003, all of the Settling States except Missouri amended the allocable share release provision in their

Escrow Statutes such that an NPM is entitled to the release of escrow only to the extent the escrow deposit in a given state exceeds the amount the NPM would have paid had it joined the MSA as an SPM.  See, e.g., N.Y. Pub. Health Law § 1399-pp(2)(b)(ii).

In order to enforce compliance with the Escrow Statutes, the Settling States enacted complementary Contraband Statutes. The Contraband Statutes generally provide that an NPM's cigarettes cannot receive an excise tax stamp for sale, and therefore cannot be sold, in a Settling State absent an NPM's certification that it is in compliance with the state's Escrow Statute.  Violation of a Contraband Statute may result in civil monetary penalties, suspension or cancellation of a distributor's license to stamp cigarettes, and/or seizure of an NPM's cigarettes.  See, e.g., N.Y. Tax Law §§ 480-b, 481(1)(c), 1846.  In some states, these statutes, known as "complementary legislation," establish a directory of manufacturers approved to sell cigarettes in-state.  See, e.g., Ala. Code § 6-12A-3.

### C.   Payments to the Settling States

The following information is taken from the report of the States' expert Dr. Jonathan Gruber.  The Court emphasizes that Plaintiff has not objected to the admissibility of Dr. Gruber's report, nor has it submitted contradictory empirical data.  OPM MSA payments in 2007 were approximately $5.29953 per carton or $0.02650 per cigarette.  (Gruber Rep. ¶ 5).  SPM MSA payments in

2007 for cigarettes sold in excess of any grandfathered share were approximately $5.06638 per carton or $0.02533 per cigarette. (Id. ¶ 7). NPM escrow payments in 2007 were approximately $5.02138 per carton or $0.025107 per cigarette. (Id. ¶ 8).

Grandfathered SPM payments are slightly different. Grandfathered SPMs that sell at or below their grandfathered share make no MSA payments. Plaintiff submits that this exemption provides grandfathered SPMs with a competitive advantage over NPMs. However, Dr. Gruber notes that the vast majority of grandfathered SPMs sell above their grandfathered share, at which point they made the 2007 $0.02533 per-cigarette MSA payment. (Id. ¶ 17; Leung Decl., Ex. Z (listing fifteen grandfathered SPMs in 2008, only three of which sold below their grandfathered share)). While a grandfathered SPM's average per-cigarette MSA payment is lower than both OPM MSA payments and NPM escrow payments, the marginal cost of producing each cigarette above the grandfathered share is still higher than the cost increases NPMs incur due to escrow payments and lower than the cost increases of OPMs. To be sure, the MSA regulatory scheme imposes additional costs on all cigarette manufacturers, but the NPMs' escrow costs are less than OPMs' and SPMs' MSA payments. (Gruber Rep. ¶¶ 20-23).

OPMs, SPMs, and NPMs likely pass on these costs to consumers in the form of higher cigarette prices.  But the differential in cost increases should logically create an opportunity for continued competition among OPMs, SPMs, and NPMs.  Indeed, after the implementation of the MSA, NPM market share grew markedly, from about 0.4% of the market in 1997 to slightly more than 8% in 2003.  (Eisenstadt Rep. ¶ 12).  Although NPM market share subsequently declined to about 5.4% in 2007,[4] NPMs have substantially increased their share of the U.S. cigarette market since the inception of the MSA.  This increase occurred in a shrinking cigarette market.  Overall, this evidence paints a picture of an actively competitive cigarette market.

### D.   Grand River

Grand River is a Canadian tobacco manufacturer owned by First Nations members of the Iroquois Confederacy.  Grand River operates on Six Nations' reservation land in Ontario.  Grand River's Seneca brand cigarettes are imported into the United States through two companies, Native Wholesale Supply and Tobaccoville USA, Inc.  Native Wholesale Supply sells Seneca brand cigarettes exclusively on Native American reservations in

---

[4] Judge Hellerstein attributed the decline in total NPM market share from 2003 to 2007 to the fact that General Tobacco, a large NPM, joined the MSA as an SPM in July of 2004.  <u>Freedom Holdings, Inc. v. Cuomo</u>, 592 F. Supp. 2d 684, 691 n.5 (S.D.N.Y. 2009).

the United States.  Tobaccoville imports Seneca brand cigarettes
and distributes them off-reservation in several states.  Because
Grand River is an entity that "manufactures cigarettes anywhere
that such manufacturer intends to be sold in the United States,"
see, e.g., N.Y. Pub. Health Law § 1399-oo(9)(a), the States
consider Grand River to be an NPM.  (Violi Decl. ¶ 3).

The undisputed deposition testimony establishes that Grand
River and its distributors make independent pricing decisions.
Jerry Montour, the de facto CEO of Grand River, testified that
Grand River considers "potential for [sales] volumes in the
future and long-term . . . [r]aw materials, wages, overhead,
[and] profit" in determining the price at which it sells its
cigarettes to Native Wholesale Supply and Tobaccoville.  (Leung
Decl., Ex. G, Deposition of Jerry Montour at 293-94).  Grand
River's pricing to Native Wholesale Supply and Tobaccoville is
not affected by OPM, SPM, or NPM price changes.  For example,
Mr. Montour explained that "[i]f Marlboro or any of the other
larger manufacturers choose to have a price increase because
they are able to bear it in the U.S. market, no, we do not
necessarily react to that by raising our costs to Tobaccoville."
(Id. at 675).  Similarly, Grand River's price point does not
change in response to:  an OPM's decision to increase the price
of a premium brand of cigarettes (id. at 673-75); an OPM's
decision to increase the price of a discount brand of cigarettes

(id. at 676); a grandfathered SPM's decision to increase prices
(id. at 678-80); or another NPM's decision to raise prices of a
fourth-tier brand of cigarettes similar to Grand River's Seneca
brand. (id. at 681).

Native Wholesale Supply and Tobaccoville set the price of
Grand River cigarettes for the U.S. market.  Arthur Montour, the
sole owner and president of Native Wholesale Supply, testified
that the MSA and Escrow Statutes have no affect on the price
Native Wholesale Supply charges for Grand River cigarettes in
Native American territories.  (Leung Decl., Ex. K, Deposition of
Arthur Montour at 295, 298).  Larry Phillips, the president of
Tobaccoville, explained that Tobaccoville has the discretion to
sell Grand River cigarettes in any state, as long as it does not
sell in Native American territory.  (Leung Decl., Ex. J,
Deposition of Larry Phillips at 64).  As of June 2008,
Tobaccoville sold Grand River cigarettes in North Carolina,
South Carolina, Tennessee, and Georgia,[5] as well as in three non-
MSA states.  (Id. at 72).  Tobaccoville sets the price for Grand
River cigarettes sold in each state; no state has limited the
number of cigarettes that can be sold or directed Tobaccoville
to sell cigarettes at a particular price, either in that state
or in any other state.  (Id. at 92-94, 150-52).  In fact Mr.

---

[5] As of August 2009, it appears that Grand River cigarettes are
no longer sold off-reservation in Georgia.  (Decl. of Steve
Williams at ¶ 11).

Phillips testified that Tobaccoville has sold Seneca brand cigarettes at a loss in Tennessee, at the same time that it charged a profit-producing price in North Carolina and Georgia. (Id. at 75-76). In setting its prices, Tobaccoville considers the cost of purchasing cigarettes from Grand River, the federal excise tax, the U.S. Department of Agriculture tobacco settlement cost, escrow payments, and its own profit. (Id. at 72-74, 82). Seneca cigarettes are not the cheapest brand on the market; instead, Tobaccoville sets its price based on what the market will bear. (Id. at 80, 135, 151).

### E.   Procedural History

Grand River filed its initial complaint in 2002, alleging that the MSA and its implementing legislation violated the dormant Commerce Clause, the Foreign Commerce Clause, the Indian Commerce Clause, the Sherman Act, the Equal Protection Clause, the Due Process Clause, the First Amendment, 42 U.S.C. § 1983, and that the MSA was preempted by the Federal Cigarette Labeling and Advertising Act. On September 29, 2003, this Court dismissed all claims against the Attorneys General of each state except New York pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure for lack of personal jurisdiction; it also granted Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim as to all States. See Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068, 2003 WL 22232974

12

(S.D.N.Y. Sept. 29, 2003).  On July 15, 2004, the Court granted Plaintiff's motion for reconsideration of the November 29, 2003 ruling and reinstated the Sherman Act claim against the New York Attorney General in light of the Second Circuit's decision in Freedom Holdings, Inc. v. Spitzer, 357 F.3d 205 (2d Cir. 2004), a case presenting claims essentially identical to those in the case at bar.  See Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068, 2004 WL 1594869 (S.D.N.Y. July 15, 2004).  On November 3, 2004, the Court granted Plaintiff's Rule 54(b) motion and directed entry of final judgment so that Grand River could appeal the Rule 12(b)(2) and 12(b)(6) dismissals. See Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068, 2004 WL 2480433 (S.D.N.Y. Nov. 3, 2004).

On appeal, the Second Circuit found that this Court could exert personal jurisdiction over the non-New York Defendants. Therefore, the Second Circuit reversed in part and reinstated the Commerce Clause claim, finding that Plaintiff had stated "a possible claim that the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions." Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158, 173 (2d Cir. 2005).

Plaintiff subsequently moved for a preliminary injunction preventing the Defendant States from enforcing the amended allocable share provisions of their Escrow Statutes.  Following a three day hearing, the Court found that Grand River was not likely to suffer irreparable harm or to succeed on the merits of its Sherman Act and Commerce Clause claims.  See Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068, 2006 WL 1517603, at *8-10 (S.D.N.Y. May 31, 2006).  The Second Circuit affirmed the denial of an injunction on the grounds that Grand River did not demonstrate a likelihood of irreparable harm. Grand River Enters. Six Nations, Ltd. v. Pryor, 481 F.3d 60 (2d Cir. 2007) (per curiam).

On November 9, 2009, the parties filed the instant cross motions for summary judgment.

## II.      Evidentiary Motions

Before delving into the summary judgment analysis, the Court must first determine what evidence may be considered in support of the parties' respective motions.  See Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997) ("[O]nly admissible evidence need be considered by the trial court in ruling on a motion for summary judgment.").  As previously mentioned, the States have submitted the expert report of Dr. Jonathan Gruber, and Grand River does not contest its admissibility.  Grand River has submitted the expert reports of Dr. David Eisenstadt and Dr.

14

Jeremy Bulow.  The States move to exclude Grand River's expert reports under Rule 702 of the Federal Rules of Evidence. Rule 702 provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Rule 702 requires the district court to act as a gatekeeper to ensure that expert testimony "both rests on a reliable foundation and is relevant to the task at hand." Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597 (1993).  Thus, in assessing admissibility, the court must first determine whether the proffered expert testimony is relevant, that is whether it "ha[s] any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.  Then, the court considers whether "the reasoning or methodology underlying the testimony is scientifically valid and . . . whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592-93. Daubert set forth a non-exclusive list of factors that the court might consider in gauging the scientific validity of proffered

testimony, including: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error and whether standards and controls exist and have been maintained with respect to the technique; and (4) the general acceptance of the methodology in the scientific community.  Id. at 593-95.

In assessing the reliability of proffered expert testimony, the court must "focus on the principles and methodology employed by the expert, without regard to the conclusions the expert has reached or the district court's belief as to the correctness of those conclusions."  Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 266 (2d Cir. 2002).  "Although expert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison, other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony."  Boucher v. U.S. Suzuki Motor Corp., 73 F.3d 18, 21 (2d Cir. 1996) (per curiam) (internal quotations and citations omitted).  In other words, Rule 702 "embodies a liberal standard of admissibility for expert opinions."  Nimely v. City of New York, 414 F.3d 381, 395 (2d Cir. 2005).

Dr. Eisenstadt holds a Ph.D. in Economics from the University of Illinois at Urbana-Champaign.  After completing his doctoral studies, Dr. Eisenstadt worked as a Senior Economist at the Antitrust Division of the U.S. Department of Justice.  In 1991, he founded a private consulting company which offers economic advice to clients in antitrust and other litigation.

The overarching theme of Dr. Eisenstadt's September 29, 2008 initial report is that the NPM Adjustment provision in the MSA provides an incentive for OPMs to raise cigarette prices more than necessary to recoup MSA costs, in turn "shedding" market share to NPMs in order to reap the benefit of the NPM Adjustment and lower their MSA payments.  He performs three analyses to link historical OPM price increases to the NPM Adjustment in support of his proposition that the MSA has an adverse effect on competition.  Specifically, Dr. Eisenstadt conducted:  (1) a game theory analysis, which indicates that the NPM Adjustment caused OPMs to increase their prices by approximately $0.02 to $0.05 per pack (in 2007 dollars); (2) an oligopoly simulation, which suggests that the NPM Adjustment caused OPMs to increase their prices by approximately $0.06 per pack (in 2007 dollars); and (3) a regression analysis, which indicates that the NPM Adjustment caused OPMs to raise their

prices by approximately $0.04 to $0.05 per pack (in 2007 dollars).  (Eisenstadt Rep. ¶ 89).

On May 14, 2009, Dr. Eisenstadt submitted a supplemental report to address questions raised by defense counsel during his deposition.  After adjusting his analyses to account for various issues highlighted by defense counsel, Dr. Eisenstadt again concluded that the NPM Adjustment caused OPMs to raise their prices by between $0.01 and $0.05 per pack (in 1997 dollars). Additionally, Dr. Eisenstadt performed several new analyses to illustrate the amount of consumer loss attributable to: (1) the MSA and original Escrow Statutes; (2) the original Escrow Statutes alone; and (3) the current Escrow Statutes as amended to change the allocable share release provision.

There is no contention that Dr. Eisenstadt is unqualified to offer an expert opinion in this case.  Instead, Defendants attack alleged flaws in Dr. Eisenstadt's models which render his conclusions unreliable.  Specifically, Defendants argue that the game theory analysis fails to explain cigarette prices in time periods outside of those he considered, considers only two OPMs selling two products each, which is not reflective of the actual cigarette market, and contains two mathematical errors, including an "elasticities matrix" that produces economically impossible results.  Regarding the oligopoly simulation, Defendants contend that Dr. Eisenstadt used the wrong discount

rate when converting cigarette prices to 1997 dollars and that his model fails to account for attorneys' fees the OPMs must pay. Finally, Defendants argue that Dr. Eisenstadt's regression analysis, which includes a factor called NPMADJOPPCOST that is meant to represent an OPM's potential NPM Adjustment, does not take into account historical declines in the volume of cigarettes sold between 1997 and 2003 and is overly influenced by two outlier data points.

It is important to note that Defendants in no way challenge the scientific validity of game theory analysis, oligopoly simulation, or regression analysis. There is no dispute that these are textbook economic methodologies which are generally accepted and widely used by economists to predict prices in various contexts. Instead, Defendants question certain data Dr. Eisenstadt used in his calculations and conclusions he drew from the results.[6]   These arguments do not diminish the reliability

---

[6] The Court notes that there are serious conceptual issues with Dr. Eisenstadt's "shedding" market share theory. First, it assumes that OPMs shed market share to NPMs but not to SPMs, an outcome that is simply not in the power of the OPMs to control. Additionally, it ignores the fact that increased competition from NPMs alone is not enough to trigger the NPM Adjustment.  No matter how much market share OPMs lose to NPMs, the NPM Adjustment will not apply in a Settling State that has passed and diligently enforced an Escrow Statute, nor will it apply without a finding that the disadvantages of the MSA were a significant factor contributing to the loss of market share. Thus, the MSA itself may derail Dr. Eisenstadt's incentive theory if OPMs are never able to recoup lost profits with the NPM Adjustment.  However, these concerns stem from Dr.

of the process or methodology employed.  See Amorgianos, 303
F.3d at 267 ("A minor flaw in an expert's reasoning or a slight
modification of an otherwise reliable method will not render an
expert's opinion per se inadmissible.  The judge should only
exclude the evidence if the flaw is large enough that the expert
lacks good grounds for his or her conclusions." (internal
quotation omitted)).

Dr. Bulow received his Ph.D. in Economics from the
Massachusetts Institute of Technology.  He served as the
Director of the Bureau of Economics of the Federal Trade
Commission from 1998 to 2001, and currently works as a Professor
of Economics at Stanford University's Graduate School of
Business.  He has published extensively in the areas of
microeconomic theory, corporate finance, and pensions, and on
the topic of tobacco taxes and the MSA.  Dr. Bulow's September
29, 2008 report sets forth three main propositions:  (1) the MSA
and its implementing legislation are in essence a set of
national excise taxes; (2) the MSA and its implementing
legislation operate extraterritorially in that the regulatory
payment scheme in each Settling State depends on commercial
activity nationwide; (3) the Allocable Share Amendments show

---

Eisenstadt's conclusions, not his methodology, and therefore are
not grounds for exclusion.

that the MSA is an inter-connected and coercive state regulatory scheme.  (Bulow Rep. at 2-3).

There is no question as to Dr. Bulow's expert qualifications.  However, unlike Dr. Eisenstadt, Dr. Bulow did not perform any mathematical or statistical analyses; his expert report is more of a white paper or policy statement about how the MSA and Escrow Statutes function.  Dr. Bulow came to his conclusions by applying economic principles to a series of "thought experiments such as what would happen if there were small changes in one or more company's sales."  (Id. at 6).  Dr. Bulow's report is not "scientific" in nature and is difficult to fit into the Daubert framework.  See Liriano v. Hobart Corp., 949 F. Supp. 171, 177 (S.D.N.Y. 1996) ("It is not appropriate to invoke the Daubert test in cases where expert testimony is based solely on experience or training, as opposed to a methodology or technique.  Indeed, it would be impossible to do so."). Instead, the Court considers whether the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue."  Fed. R. Evid. 702.  The usefulness of Dr. Bulow's explanation of the mechanics of the MSA and Escrow Statues in turn depends on the question of relevance.

The Court recognizes that a determination of relevance under Rule 401 is generally the first step in a Daubert analysis.  The problem in this case is that Plaintiff

commissioned three expert reports, but does not rely on any of them in support of its motion for summary judgment and only fleetingly refers to Dr. Eisenstadt's initial report and Dr. Bulow's report in its opposition to the States' motion for summary judgment.  Indeed, Plaintiff acknowledges that the expert reports were written months prior to the summary judgment briefs, and Plaintiff may well have chosen to pursue arguments different from those raised by their experts.  The fact that Plaintiff does not rely on Drs. Eisenstadt and Bulow raises serious questions about the relevance of the evidence to the surviving claims, but there seems little point in making a paragraph-by-paragraph assessment of the relevance of evidence that is, for all intents and purposes, not being offered.  A broad ruling excluding the evidence in its entirety is little more than an academic exercise.  As Drs. Eisenstadt and Bulow are otherwise qualified to give expert opinions, the Court will consider the relevance of those pieces of the expert reports Plaintiff does refer to in the course of the Sherman Act and Commerce Clause analysis.  The Court makes no finding with respect to the rest of Defendants' challenges to the reports under Rule 401.  Dr. Eisenstadt's supplemental report is not mentioned once in either party's papers, so the Court sees no reason to determine its admissibility at this time.

### III.    Substantive Claims

Summary judgment is appropriate when the pleadings and admissible evidence show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  A genuine dispute exists for summary judgment purposes "where the evidence is such that a reasonable jury could decide in the non-movant's favor."  Beyer v. County of Nassau, 524 F.3d 160, 163 (2d Cir. 2008) (citing Guilbert v. Gardner, 480 F.3d 140, 145 (2d Cir. 2007)).  In determining whether summary judgment is appropriate, a court must resolve all ambiguities and draw all reasonable inferences against the moving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

### A.    Sherman Act

Plaintiff presents a multi-layered antitrust attack on the MSA, Escrow Statutes, and Contraband Statutes.  First, Plaintiff argues that the MSA, as implemented by the Escrow and Contraband Statutes, is a per se violation of § 1 of the Sherman Act.  On the basis of this per se violation, Plaintiff contends that the Escrow and Contraband Statutes are preempted by federal antitrust law.  In connection with the preemption claim,

23

Plaintiffs argue that the Escrow Statutes are not saved by the state action immunity doctrine of Parker v. Brown.

### 1.   Per Se Violation

Unlike the Freedom Holdings plaintiff, Grand River challenges the MSA as well as its implementing legislation. Plaintiff moves for summary judgment on the sole ground that the MSA is an agreement among competitors to raise their own and their rivals' costs, which is a per se violation of § 1 of the Sherman Act.

### a.   Standing

The Second Circuit's most recent opinion in Freedom Holdings raises an important issue with respect to Grand River's standing to challenge the MSA, which the Court will address sua sponte.[7]   In order to obtain the injunctive relief it seeks, a private plaintiff must demonstrate that it is threatened with "loss or damage by a violation of the antitrust laws."  Clayton Act § 16, 15 U.S.C. § 26.  This so-called antitrust injury must be "the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." Cargill, Inc. v. Monfort of Colo., Inc., 479 U.S. 104, 113 (1986); cf. Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489 (1977) (plaintiff seeking treble damages under § 4 of

---

[7] The Court assumes that Plaintiff has Article III standing.  The States have not suggested otherwise.

the Clayton Act must show antitrust injury that "reflect[s] the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation"). Thus, "[t]he antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior." Atl. Richfield Co. v. USA Petroleum Co., 495 U.S. 328, 344 (1990).

Grand River argues that the MSA is an agreement among competitors not only to raise their own costs (and, consequently, prices), but also an agreement to raise NPMs' costs. As an initial matter, the MSA standing alone cannot and does not impose any obligations on NPMs. The MSA embodies an agreement by OPMs and SPMs to pay settlement costs to the Settling States; following Plaintiff's theory, the MSA would be an agreement among competitors to shoulder additional costs, which, without reference to Escrow Statutes, benefits NPMs. The MSA does provide for a model Escrow Statute as a mechanism to offset price advantages NPMs gain by not having to make MSA settlement payments; however, it is the implementing Escrow Statutes, which were passed and are enforced by the States, not the MSA itself, that affect NPMs' costs. Indeed, Plaintiff cannot point to any injury occasioned by the MSA operating apart from its implementing legislation. As the Second Circuit noted, an NPM cannot directly challenge the MSA even though "a

conspiracy among MSA participating manufacturers to fix prices or to divide the cigarette market among themselves would certainly violate the antitrust laws [because] such a violation would not threaten plaintiffs with loss or damage." Freedom Holdings, Inc. v. Cuomo, 624 F.3d 38, 51-52 (2d Cir. 2010) (internal citations omitted).

Nevertheless, given the interlocking nature of the MSA and Escrow and Contraband Statutes, it is at least arguable that increased NPM costs are attributable to the MSA.  However, the NPMs' increased costs, in the form of escrow payments, are still less than the MSA costs of OPMs, SPMs, and grandfathered SPMs selling in excess of their grandfathered share.  Any cost increases the MSA levies against NPMs are counterbalanced by the greater cost increases the OPMs and SPMs took upon themselves in the form of MSA settlement payments.  Indeed, the NPMs' overall increase in market share since the MSA went into effect evidences the fact that the MSA has not impeded NPMs' ability to compete.  Moreover, Plaintiff's own expert Dr. Eisenstadt contends that the MSA incentivizes OPMs to raise cigarette prices in order to cede market share to NPMs; assuming without deciding that this is true, the MSA would be an agreement among competitors to allow rival NPMs to flourish in an attempt to trigger the NPM Adjustment to reduce their own MSA payments.  In other words, the MSA provides NPMs with a competitive advantage

even taking into account the cost-increasing escrow payments.
Even if the MSA is an agreement among competitors to raise
rivals' costs, Plaintiff has not demonstrated an antitrust
injury flowing from this agreement, and therefore lacks standing
to challenge the MSA directly.

### b.    Raising Rivals' Costs

Although the Court finds that Plaintiff does not have
standing to challenge the MSA under the federal antitrust laws,
it considers the Sherman Act challenge in an abundance of
caution.  Plaintiff argues that in the MSA, the OPMs agreed on a
mechanism to impose specific per-cigarette costs on their
competitors in the form of escrow payments, and this agreement
constitutes price fixing.

Section 1 of the Sherman Act forbids "[e]very contract,
combination in the form of trust or otherwise, or conspiracy, in
restraint of trade or commerce among the several States."  15
U.S.C. § 1.  Due to their "pernicious effect on competition and
lack of any redeeming virtue," certain agreements are considered
conclusively illegal without further analysis under the rule of
reason.  Northern Pacific Ry. Co. v. United States, 356 U.S. 1,
5 (1958).  Horizontal price fixing – i.e., an agreement among
competitors to fix prices – is a classic example of conduct
deemed illegal per se under the Sherman Act.  See Catalano, Inc.
v. Target Sales, Inc., 446 U.S. 643, 647 (1980); Arizona v.

Maricopa County Med. Society, 457 U.S. 332, 344-48 (1982);
United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 223 (1940)
("Under the Sherman Act a combination formed for the purpose and
with the effect of raising, depressing, fixing, pegging, or
stabilizing the price of a commodity in interstate or foreign
commerce is illegal per se.").  Two federal Courts of Appeals
have extended the definition of illegal price fixing to include
agreements that fix costs, an element of price.  Plaintiff
relies on National Electrical Contractors Association, Inc. v.
National Constructors Association, 678 F.2d 492 (4th Cir. 1982),
and Premier Electrical Construction Company v. National
Electrical Contractors Association, Inc., 814 F.2d 358 (7th Cir.
1987), in support of its price fixing argument.

These related cases involved the National Electrical
Contractors Association ("NECA"), a trade association for
electrical workers.  The National Constructors Association and
Premier Electrical Construction Company did not belong to NECA
and competed with NECA members for contracts.  National
Constructors and Premier Electrical did not pay NECA dues and
service charges, giving them a cost advantage when bidding for
projects against NECA members.  The International Brotherhood of
Electrical Workers ("IBEW") is a labor union representing the
majority of electrical workers nationwide.  In 1976, NECA
entered into a national agreement with the IBEW requiring each

employer who entered into a contract with an IBEW member, regardless of whether that party also belonged to NECA, to contribute 1% of its gross labor payroll into an industry fund. The Fourth Circuit found that "[b]y taking the additional 1% of labor costs from non-NECA contractors it robs them of a competitive advantage beneficial to the public. . . . The industry fund would tend to stabilize the price of electrical construction contracts, a practice illegal per se under the Sherman Act." Nat'l Elec. Contractors Ass'n, 678 F.2d at 501. The Seventh Circuit essentially agreed that NECA "used the [IBEW] to increase its rivals' costs of doing business, the better to eliminate a source of competition." Premier Elec. Constr. Co., 814 F.2d at 368. Plaintiff analogizes the OPMs' position to that of NECA and the States' position to that of the IBEW, with the MSA, acting through the Escrow Statutes, as the means by which the two parties allegedly raised rivals' costs.

Plaintiff's comparison of the MSA to the NECA cases is inapt for several reasons. As discussed above, the costs about which Plaintiff complains are imposed by the Escrow Statutes, not the agreement between OPMs and the Settling States. Setting that fundamental problem aside, first, the Fourth and Seventh Circuits invalidated the NECA-IBEW contract because the 1% industry fund payment eliminated non-NECA constructors' cost advantage, thereby stabilizing the market price of electrical

contracts.   Therein was the "pernicious effect on competition" that led to the contract's demise under a price fixing theory. Here, on the other hand, the MSA preserves NPMs' cost advantages.   Plaintiff mistakes a price-increasing mechanism for price fixing, but in this case, one proposition does not follow the other.   MSA and escrow payments can cause the price of cigarettes to rise, as manufacturers pass on their increased costs to consumers, but those increased prices are not stabilized or fixed in any manner.   Instead, as Dr. Gruber has testified and the Second Circuit has found, escrow payments mimic a flat tax that applies across the board to NPMs.   See Gruber Rep. ¶¶ 13-14, 24; Freedom Holdings, 624 F.3d at 56. There is no evidence that NPMs cannot or do not exploit whatever cost advantages they had pre-MSA.   Nor is there any evidence that normal market mechanisms are discontinued after the escrow cost is factored into NPM prices.   Moreover, NPM escrow payments are on balance lower than OPM and SPM MSA payments, meaning that NPMs still enjoy a cost, and, in turn, a price advantage over their competitors.   See Gruber Rep. ¶ 24 ("In summary, without the States' escrow statutes, the NPMs would have a substantial marginal cost advantage over both OPMs and SPMs. . . . [H]owever, even with the escrow statutes, the NPMs have a marginal cost advantage that they would not have had absent the adoption of the MSA and amended escrow statutes together.   To be

30

clear, however, the fact that the MSA and escrow statutes impose higher or lower per cigarette costs on different industry participants simply means that they operate like differential taxes, and differential taxes do not in any way promote or dissuade price fixing or other cartel behavior.").  The testimony of Grand River, Native Wholesale Supply, and Tobaccoville's executives discloses that the MSA does not restrict them from pricing cigarettes as they choose, and NPMs collectively have exploited this pricing autonomy to gain market share from OPMs and SPMs.  The MSA's cost-increasing function, as implemented by the Escrow and Contraband Statutes, lacks the hallmark features of price fixing, and therefore, Plaintiff has not made out a per se Sherman Act violation.

Second, the NECA cases involved an agreement between private parties.  Here, however, the States entered into the MSA, and state legislatures subsequently passed their respective Escrow and Contraband Statutes.  Sovereign state acts are ipso facto immune from antitrust liability.  Hoover v. Ronwin, 466 U.S. 558, 568 (1984); Parker v. Brown, 317 U.S. 341, 351 (1943). Thus, even if the States' participation in the MSA adversely affects competition in the cigarette market, these actions are exempt from the reach of the Sherman Act.  See Freedom Holdings, 624 F.3d at 59; Xcaliber Int'l Ltd. v. Attorney Gen. of La., 612 F.3d 368, 378-80 & n.11 (5th Cir. 2010); Grand River Enters. Six

Nations, Ltd. v. Beebe, 574 F.3d 929, 939-41 (8th Cir. 2009);

Sanders v. Brown, 504 F.3d 903, 914-19 (9th Cir. 2007).

### 2.   Preemption of the Escrow and Contraband Statutes

Plaintiff separately argues that the Escrow and Contraband

Statutes are preempted by the Sherman Act.  A state law will

only be preempted when it presents an "irreconcilable conflict"

with federal antitrust law.  Rice v. Norman Williams Co., 458

U.S. 654, 659 (1982).   The test for Sherman Act preemption is

two-fold.  First, the Court must determine whether the state

regulatory scheme "mandates or authorizes conduct that

necessarily constitutes a violation of the antitrust laws in all

cases, or if it places irresistible pressure on a private party

to violate the antitrust laws in order to comply with the

statute."  Id. at 661.  The Supreme Court distinguishes between

state laws that regulate unilaterally and so-called "hybrid"

restraints that grant private parties regulatory control over

competition.  See 324 Liquor Corp. v. Duffy, 479 U.S. 335, 341-

43 (1987) (striking down New York Alcoholic Beverage law that

required New York liquor retailers to participate in a resale

price maintenance regime); Fisher v. City of Berkeley, 475 U.S.

260, 268-69 (1986).  A hybrid restraint will similarly be struck

down where it "mandates or authorizes" a per se violation of the

Sherman Act.  However, "[a] state regulatory scheme is not pre-

empted by the federal antitrust laws simply because in a

32

hypothetical situation a private party's compliance with the statute might cause [it] to violate the antitrust laws," nor will the court invalidate a state statute "simply because the state scheme might have an anticompetitive effect." Rice, 458 U.S. at 659.

The Court must next determine if the Parker state action immunity doctrine nonetheless immunizes the state from liability for creating a regulatory scheme which would otherwise constitute a per se violation of the Sherman Act. Generally, a statute that permits or compels private parties to engage in per se violations of the federal antitrust laws will be saved from preemption if:  (1) the restraint in question is "clearly articulated and affirmatively expressed as state policy," and (2) the policy is "actively supervised" by the state itself. Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980).  State action immunity does not apply where "what appears to be a state- or municipality-administered price stabilization scheme is really a private price-fixing conspiracy, concealed under a 'gauzy cloak of state involvement.'"  Fisher, 475 U.S. at 269 (quoting Midcal, 445 U.S. at 106).

### a.   The Escrow and Contraband Statutes Do Not Mandate or Authorize a Sherman Act Violation

Although Plaintiff has only pursued its "raising rivals' costs" theory on summary judgment, the amended complaint also alleges, consistent with Freedom Holdings, that the Escrow and Contraband Statutes implement an illegal cartel that restricts output and fixes cigarette prices.  Defendants move for summary judgment on these additional preemption theories, urging that the record evidence confirms the Court's previous findings during a preliminary injunction hearing that:

> The MSA does not give OPMs or SPMs any power with respect to the output or prices of their competitors. The MSA does not create disincentives for OPMs, SPMs or NPMs to restrict output or to avoid reducing prices.  Finally, there is no evidence to show that the Escrow Statutes enforce or implement OPMs' or SPMs' private market decisions made pursuant to the MSA.

Grand River, 2006 WL 1517603, at *9.

The parties' briefs on this point are so garbled as to obscure the actual issue before the Court – that is, whether the Escrow and Contraband Statutes, on their faces, irreconcilably conflict with the Sherman Act by mandating or authorizing cigarette manufacturers to engage in anticompetitive behavior. See Rice, 458 U.S. at 659.  Plaintiff's opposition is entirely focused on a litany of alleged anticompetitive aspects of the MSA, primarily that:  (1) the possibility of an NPM Adjustment incentivizes OPMs to raise their prices more than necessary to

recoup MSA settlement payments in order to shed market share to NPMs; and (2) special exemptions for grandfathered SPMs incentivize them to restrict output and sell at or below their grandfathered shares.  It bears noting that the MSA is not a state statute to be preempted.  Thus, the Court need not wade through the parties' extensive arguments about whether or not the MSA creates an output cartel because Plaintiff fails to identify any provision in the Escrow and Contraband Statutes that mandates or authorizes such anticompetitive conduct.[8]

Plaintiff has alleged that the MSA's incentive structure places irresistible pressure on OPMs and SPMs to restrict output and fix prices.  This does not explain how the Escrow and Contraband Statutes place irresistible pressure on NPMs to violate the antitrust laws.  See Xcaliber, 612 F.3d at 375 ("Since [Louisiana's Escrow Statute] does not affect PMs, the only parties potentially facing 'irresistible pressure' from the [Escrow Statute] are NPMs.  Although the [Escrow Statute] forces NPMs to charge a higher price for their products to maintain the same level of profitability, it does not pressure them to conspire together to set a specific price, to carve up markets,

---

[8] Therefore, the Court need not decide the parties' countless disputes about which expert used the correct methodology to calculate MSA-related costs, which expert contradicted himself, and so on.  As Dr. Eisenstadt's OPM market share "shedding" theory has no bearing on any anticompetitive aspect of the Escrow Statutes, it is irrelevant to Plaintiff's opposition to summary judgment on the Sherman Act preemption claim.

or otherwise to violate antitrust law."); <u>Sanders</u>, 504 F.3d at
911 ("If NPMs wish to remain profitable, they must factor the
escrow payments into the prices they charge per cigarette.
[California's Escrow Statute] thus may cause higher prices and
dissuade some potential market entrants.  Nothing, however,
forces the NPMs to either peg their prices to those of
participating manufacturers, or to refrain altogether from
entering the market.").  In <u>Freedom Holdings</u>, the plaintiff
bridged this gap by alleging that "the severity of the escrow
payments established by the challenged statutes coerced NPMs to
join the allegedly anticompetitive MSA."  624 F.3d at 54.  The
<u>Grand River</u> Plaintiff has made no such allegations.

     Although Plaintiff has not pursued anything resembling the
<u>Freedom Holdings</u> coercion theory, the Court additionally finds
that there is no evidence that the Escrow Statutes conscript
NPMs into the MSA.  The amended complaint contends only that the
Settling States "have discriminated in favor of SPMs and [OPMs]
by requiring Grand River to join and make payments under the
MSA, or make payments under the Escrow Statutes, in amounts
greater than that which Exempt SPMs and other SPMs and the
[OPMs] must pay under the MSA."  Am. Compl. ¶ 118.  The record
evidence does not expose such "discrimination."  Dr. Gruber
calculated the relative costs of compliance with the MSA and
Escrow Statutes as follows:  in 2007, OPMs paid $5.29953 per

carton in MSA settlement payments; SPMs selling in excess of any
grandfathered share paid $5.06638; and NPMs paid $5.02138 per
carton in escrow costs.  Plaintiff vigorously disputes these
findings, arguing that Dr. Gruber computed average costs instead
of marginal costs, that some SPMs have higher MSA costs than
OPMs, and that grandfathered SPMs selling at or below their
grandfathered shares have zero MSA costs.  However, these
arguments attack the weight of the evidence, which is not an
issue for the Court to decide on summary judgment.  Plaintiff
may quibble with Dr. Gruber's math, but critically it failed to
submit evidence of any actual calculations that contradict the
overall observation that NPM escrow costs are lower than MSA
settlement payments.  Cf. Freedom Holdings, 624 F.3d at 55-56.
Plaintiff has not raised a genuine issue of material fact
suggesting that the Escrow Statutes coerce NPMs to join the MSA.
Consequently, there is no evidence that the Escrow and
Contraband Statutes mandate, authorize, or place irresistible
pressure on NPMs to join an illegal output cartel.

Instead, Plaintiff has alleged that the Escrow and
Contraband Statutes authorize OPMs and SPMs to violate the
Sherman Act by enforcing their alleged regime of supra-
competitive cigarette prices.  This is a variation on the hybrid
restraint theory in Freedom Holdings.  First, the Court finds
that the Escrow and Contraband Statutes are not a hybrid

37

restraint of trade. The statutes do not delegate any degree of private regulatory power to OPMs or SPMs. On their faces, the Escrow Statutes do nothing more than set a per-cigarette payment NPMs must make for each cigarette sold in the state. The Contraband Statutes enforce the Escrow Statutes by requiring NPMs to certify that they are in compliance with state regulations, and, in some cases, by establishing a registry of manufacturers approved to sell cigarettes in-state. Statutory escrow payments are not defined by or tied to OPMs or SPMs. This Court agrees with the Court of Appeals that the Escrow and Contraband Statutes "are 'unilaterally imposed by government . . . to the exclusion of private control.'" Freedom Holdings, 624 F.3d at 53 (quoting Fisher, 475 U.S. at 266) (New York Escrow and Contraband Statute not a hybrid restraint of trade); see also Xcaliber, 612 F.3d at 376-77 (allocable share release provision of Louisiana's Escrow Statute not a hybrid restraint of trade); Grand River Enters. Six Nations, Ltd. v. Beebe, 574 F.3d at 939 (allocable share release provision of Arkansas' Escrow Statute not a hybrid restraint of trade); KT&G Corp. v. Attorney Gen. of Okla., 535 F.3d 1114, 1130-31 (10th Cir. 2008) (allocable share release provision of Kansas' and Oklahoma's Escrow Statutes not a hybrid restraint of trade).

Even if the Escrow and Contraband Statutes were a hybrid restraint, Plaintiff cannot identify any provision in the Escrow

and Contraband Statutes themselves that acts to enforce the
MSA's alleged output cartel.  The only function of the Escrow
and Contraband Statutes is to collect from each NPM a per-
cigarette fee.  These NPM cost increases do not transform the
legislation into a free pass for OPMs and SPMs to fix prices.
There is no logical explanation as to how a $.0188482 per-
cigarette cost (and likely, price) increase allows OPMs and SPMs
to set supra-competitive prices; NPMs would still be able to
gain market share in spite of the cost increase.  See Sanders,
504 F.3d at 911 ("If the OPMs really are charging artificially
high prices, and thus making artificially high profits, an NPM
conceivably could compete on price by charging a 'normal' price
and still make a 'normal' profit, even taking the escrow payment
into account.").  It is possible that the Escrow Statutes would
allow OPMs and SPMs to follow the NPM $.0188482 per-cigarette
price increase, but this is not evidence of an agreement among
manufacturers to fix prices or state authorization to make such
an agreement.  See Freedom Holdings, 624 F.3d at 56 ("There is
no doubt that escrow fees were designed to neutralize the cost
disadvantage experienced by MSA participants vis-à-vis NPMs.
But that is hardly sufficient to demonstrate that the challenged
statutes mandate or authorize MSA participants to exercise
'unsupervised private discretion' to fix prices or to penalize
gains in market shares.  Rather . . . the statutes' effort to

impose a roughly equivalent cost on NPMs to that borne by manufacturers participating in the MSA can be analogized to the imposition of a flat tax." (citations omitted)).  Additionally, evidence of the nature of the cigarette market undermines any suggestion that the Escrow Statutes allow MSA participants to engage in price fixing free from competition from NPMs.  The undisputed testimony confirms that Plaintiff and its distributors maintain the ability and discretion to sell as many Grand River cigarettes as possible at any price they chose to set.  See, e.g., Leung Decl., Ex. J, Deposition of Larry Phillips at 92-94, 150-52.  And, again, the Court notes that NPMs' dramatic increase in market share from 0.4% at the time of the MSA's enactment to 5.4% in 2007 belies Plaintiff's complaints that it can no longer meaningfully compete against MSA participants.  Furthermore, the escrow costs "like any cost, will likely be passed on to consumers in the form of higher prices, but where, as here, the state alone imposes the increased cost, there is no private collusion implicating the antitrust laws."  Freedom Holdings, 624 F.3d at 56; cf. Leung Decl., Ex. U, Deposition of David Eisenstadt at 138-39 (Plaintiff's expert's game theory and oligopoly models assume that OPMs unilaterally set their own profit-maximizing prices and do not collude).  Thus, it cannot be said that the Escrow and Contraband statutes authorize OPMs and SPMs to engage in

price fixing or other cartel behavior, and therefore, the statutes are not preempted.  In the end, Plaintiff is really arguing that the Escrow Statutes force NPMs to make escrow payments they do not want to make.  The Escrow Statutes may cause NPMs to raise the price of their products to compensate for escrow costs, but this demonstrates, at best, an anticompetitive effect of unilateral state action, not irresistible pressure to violate the Sherman Act.

The foregoing analysis applies equally to Plaintiff's motion for summary judgment.  In lieu of the output cartel theory alleged in the amended complaint, Plaintiff argues that the Escrow and Contraband Statutes implement an agreement among competitors to raise rivals' costs constituting illegal per se price fixing.  Having determined that the Escrow and Contraband Statutes do not create a hybrid restraint of trade and that the increased costs imposed on NPMs (which Plaintiff attributes to the MSA) do not constitute price fixing, it cannot be said that the Escrow and Contraband Statutes mandate or authorize a Sherman Act violation.  Therefore, Plaintiff's motion for summary judgment on its preemption claim is denied.

### b.   State Action Immunity

Additionally, Defendants are entitled to summary judgment on any and all Sherman Act claims on the basis of state action immunity.  In Parker v. Brown, the Supreme Court clarified that

41

the Sherman Act forbids anticompetitive behavior by private
actors, not by the states.  317 U.S. 341, 351 (1943).  "If the
replacing of entirely free competition with some form of
regulation or restraint was not authorized or approved by the
State then the rationale of Parker is inapposite. . . .  When
the conduct is that of the sovereign itself, on the other hand,
the danger of unauthorized restraint of trade does not arise."
Hoover, 466 U.S. at 568-69.  Thus, "where the action complained
of . . . was that of the State itself, the action is exempt from
antitrust liability regardless of the State's motives in taking
the action.." Id. at 579-80.  Parker immunity goes hand in hand
with the Court's previous finding that the Escrow and Contraband
Statutes are unilateral state action and not a hybrid restraint
of trade.  Thus, the Defendant States are immune from Sherman
Act liability for their entry into the MSA and subsequent
passage of the challenged Escrow and Contraband Statutes.  See
Freedom Holdings, 624 F.3d at 59 (agreeing with other circuits
that "the MSA and statutes enacted in furtherance of it
constitute unilateral state action exempt from the application
of the antitrust laws" under Hoover); see also Xcaliber, 612
F.3d at 378-80 & n.11; Grand River Enters. Six Nations, Ltd. v.
Beebe, 574 F.3d at 939-41; Sanders, 504 F.3d at 914-19.

     Nevertheless, the Court considers whether the Escrow and
Contraband Statutes are saved from preemption on the alternate

grounds that any anticompetitive conduct authorized therein is "clearly articulated and affirmatively expressed as state policy" and "actively supervised by the State itself." Midcal, 445 U.S. at 105. Plaintiff concedes for the purposes of this summary judgment motion that the Escrow and Contraband Statutes satisfy the first prong of the Midcal test – i.e., that the statutes reflect clearly articulated and affirmatively expressed state policy. The issue before the Court is whether the States actively supervise the allegedly anticompetitive conduct.

Freedom Holdings is particularly instructive on this point. At the motion to dismiss stage, the Second Circuit found that the Freedom Holdings complaint stated adequate facts to foreclose a state action immunity defense. Similar to the case at bar, the Freedom Holdings complaint alleged that New York's Contraband Statute protected the MSA's creation of an anticompetitive output cartel; as New York did not monitor or "review the reasonableness" of pricing decisions by the cartel, the Court could not say that the state was legitimately regulating the cigarette industry, as opposed to sanctioning a private price fixing arrangement. Freedom Holdings, 357 F.3d at 232 (quoting Midcal, 445 U.S. at 106).[9] After a bench trial, however, Judge Hellerstein found that New York satisfied the

---

[9] Based on that opinion, this Court reinstated Grand River's Sherman Act claim. See Grand River, 2004 WL 1594869, at *2-3.

active supervision requirement for <u>Parker</u> immunity because the state exercised "statistical oversight" over MSA and escrow payments.  <u>Freedom Holdings</u>, 592 F. Supp. 2d at 702.

The Second Circuit affirmed Judge Hellerstein's finding, but on slightly different grounds.  The Court clarified that "[t]he active supervision required to secure state action immunity necessarily depends on the facts of each case." <u>Freedom Holdings</u>, 624 F.3d at 61-62.  Where a state statute "effectively allowed one private party to set the prices charged by another private party," state supervision of price schedules was necessary to ensure that the anticompetitive arrangement was a true exercise of state regulatory authority, as opposed to private control.  <u>Id.</u> at 62.  On the other hand, a state statute that imposes a minimum markup on a product can satisfy the active supervision requirement by "structuring a detailed mechanism" for the price markup.  <u>Id.</u> at 62 (citing <u>Morgan v. Div. of Liquor Control</u>, 664 F.2d 353, 356 (2d Cir. 1981)).

> The critical difference then is that, in one case, a private party sets the minimum resale price (without state input or supervision) while, in the other, the state supplants normal market mechanisms only to the extent it mandates the markup.  In the latter circumstance, "although the hypothetical statute could eliminate price competition among retailers, that would result from the choice of the state rather than from the choice of the wholesaler.  Similarly, the amount of the minimum markup would be determined by the state, not by the wholesaler. . . . Accordingly, there would be nothing to supervise."

Id. (quoting 1A Phillip E. Areeda & Herbert Hovenkamp, Antitrust Law ¶ 226e, at 194 (3d ed. 2006)).

Since the Court in Freedom Holdings determined that New York's Escrow and Contraband Statutes did not enforce an output cartel engaged in price fixing, New York's alleged failure to monitor cigarette prices was immaterial.  Instead:

> [P]laintiffs' antitrust argument reduces to a claim that the challenged statutes, by raising their costs, have the effect of raising cigarette prices.  It is undeniably the state, however, that determines the cost increase by fixing the required escrow payments. Thereafter, normal market mechanisms function. . . . Accordingly, because the statute specifies the exact component of the inflated price attributable to the state, "there is nothing that the state can 'actively supervise' except to see that the statutory requirements are obeyed – and there is no claim that the state has neglected this."

Id. at 62 (quoting Battipaglia v. N.Y. State Liquor Auth., 745 F.2d 166, 176 (2d Cir. 1984)).

As in Freedom Holdings, Plaintiff argues that the States fail to meet the active supervision requirement because they do not monitor cigarette prices to ensure that the Escrow and Contraband Statutes achieve what it describes as the twin goals of the legislation: that is, leveling the playing field between MSA participants and NPMs and increasing NPMs' prices.  The States, in turn, point out that because the Escrow and Contraband Statutes do not authorize any cigarette company to agree with another on price, there is no need for the States to

supervise cigarette prices in order to receive Parker immunity.
The States urge that summary judgment in their favor is
appropriate because there is no dispute that they track MSA
payments through reporting mechanisms and analyses performed by
PricewaterhouseCoopers and enforce NPM payments through the
Escrow and Contraband Statutes.

     As previously discussed, Plaintiff has produced no evidence
that the Escrow and Contraband Statutes place irresistible
pressure on NPMs to violate the Sherman Act or that they
authorize OPMs and SPMs to engage in either an illegal output
cartel or an illegal agreement to raise rivals' costs.  The
States have determined that NPM cigarettes will be $.0188482
more expensive in part to ensure a source of settlement funds.
This cost-increasing function does not determine actual prices
charged by any cigarette manufacturer, nor does it implicate
price fixing.  Therefore, the only aspect of the statutes that
require active supervision is the collection of the per-
cigarette fee.  There is no dispute that the States have
actively enforced their Escrow Statutes, so the second prong of
the Midcal test is satisfied.  The States are immune from
Sherman Act liability for any anticompetitive conduct authorized
by the Escrow and Contraband Statutes.

     Plaintiff suggests that the States are not entitled to
Parker immunity because they act as participants in the

cigarette market.  The Court of Appeals has rejected the market
participant exception to the state action immunity doctrine in
antitrust cases.  See Automated Salvage Transp., Inc. v.
Wheelabrator Envtl. Sys., Inc., 155 F.3d 59, 79-81 (2d Cir.
1998).  This Court is bound by that precedent.  Moreover, even
if the market participant exception were viable in this Circuit,
it would not apply to the facts of this case as the States do
not manufacture, buy, or sell cigarettes.  See Freedom Holdings,
624 F.3d at 61 (declining to apply market participant exception
where New York regulates cigarette manufacturers but does not
engage in the business of manufacturing or distributing
cigarettes).

### 3.  Rule of Reason

Finally, Plaintiff maintains that the MSA and its
implementing legislation violate the Sherman Act under a rule of
reason analysis.  The Court's determination that the States are
immune from liability for their entry into the MSA and for the
passage of Escrow and Contraband Statutes under Hoover v. Ronwin
(or, alternatively, under Midcal) precludes the necessity for
further Sherman Act inquiry.

### B.  Commerce Clause

### 1.  Dormant Commerce Clause

The Commerce Clause delegates power to regulate commerce
among the states to Congress.  U.S. Const. art. I, § 8, cl. 3.

In so doing, the "dormant" aspect of the Commerce Clause limits state action that impacts interstate commerce.  Thus, the dormant Commerce Clause forbids:  (1) a state law that clearly discriminates against interstate commerce in favor of intrastate commerce; (2) a nondiscriminatory state law that "imposes a burden on interstate commerce incommensurate with the local benefits secured;" and (3) a state statute that has the practical effect of controlling commerce occurring entirely outside the state's borders.  Freedom Holdings, 357 F.3d at 216. The Second Circuit has already affirmed dismissal of Plaintiff's claim that the MSA and its implementing legislation discriminate or burden interstate commerce.  See Grand River, 425 F.3d at 168-70.  The Second Circuit clearly spelled out the Commerce Clause theory on which Plaintiff can proceed as whether "the practical effect of the challenged statutes and the MSA is to control prices outside of the enacting states by tying both the SPM settlement and NPM escrow payments to national market share, which in turn affects interstate pricing decisions."  Id. at 173.

The Supreme Court's opinions in Brown-Forman Distillers Corp. v. New York State Liquor Authority, 476 U.S. 573 (1986), and Healy v. Beer Institute, Inc., 491 U.S. 324 (1989), guide this Court's resolution of a dormant Commerce Clause claim premised on price control.  In Brown-Forman, the Court

invalidated a New York statute requiring distillers to file a
monthly price schedule in which the price charged to New York
wholesalers was no more than the price charged to any other
wholesaler in the United States.  476 U.S. at 576.  The statute
also prohibited distillers from paying promotional allowances
because the payments acted as a discount resulting in lower
prices to out-of-state wholesalers.  Id. at 577.  The Court
struck down New York's affirmation statute, finding that its
"practical effect" was to control prices in other states because
"once a distiller's posted price is in effect in New York, it
must seek the approval of the New York State Liquor Authority
before it may lower its price for the same item in other
States."  Id. at 583.  Furthermore, "[b]y defining the
'effective price' of liquor differently from other States, New
York can effectively force appellant to abandon its promotional
allowance program in States in which that program is legal, or
force those other States to alter their own regulatory schemes
in order to permit appellant to lower its New York prices
without violating the affirmation laws of those States.  Thus
New York has 'project[ed] its legislation' into other States,
and directly regulated commerce therein."  Id. at 583-84.

       In Healy, the Supreme Court considered a dormant Commerce
Clause challenge to a Connecticut statute requiring out-of-state
shippers to affirm under oath that their posted prices were no

higher than the lowest prices charged in states bordering
Connecticut at the time of affirmation.  491 U.S. at 327.  The
Court noted that the statute:  (1) controlled beer prices in
Massachusetts because a brewer's January posting of
Massachusetts beer prices would establish a ceiling for the
brewer's March prices in Connecticut; (2) controlled beer prices
in New York because brewers could offer promotional discounts in
New York "only at the cost of locking in the discounted New York
price as the ceiling for the Connecticut prices for the full 180
days of the New York promotional discount;" and (3) controlled
prices in bordering states which allowed volume discounts
because the lowest of the volume-discounted prices would by
default set the price in Connecticut.  Id. at 338-39.
Thus, the Court struck down the statute because its practical
effect was that:

> the maximum price in each State would be capped by
> previous prices in the other States.  This maximum
> price would almost surely be the minimum price as
> well, since any reduction in either State would
> permanently lower the ceiling in both.  Nor would such
> "price gridlock" be limited to individual regions.
> The short-circuiting of normal pricing decisions based
> on local conditions would be carried to a national
> scale if a significant group of States enacted
> contemporaneous affirmation statutes that linked in-
> state prices to the lowest price in any State in the
> country.  This kind of potential regional and even
> national regulation of the pricing mechanism for goods
> is reserved by the Commerce Clause to the Federal
> Government and may not be accomplished piecemeal
> through the extraterritorial reach of individual state
> statutes.

Id. at 340.

The Second Circuit's recent opinion in Freedom Holdings is particularly relevant to this analysis.  After the Court of Appeals reinstated the dormant Commerce Clause claim in this case, the Freedom Holdings plaintiff amended its complaint to add an identical price control challenge to New York's Escrow and Contraband Statutes.  Freedom Holdings, 624 F.3d at 64.  In affirming Judge Hellerstein's dismissal of the Freedom Holdings dormant Commerce Clause challenge, the Court of Appeals found that there was no evidence that New York's statutes cause Brown-Forman or Healy price gridlock as manufacturers are free to recoup the cost of complying with New York's escrow statutes by raising cigarette prices in New York, and nothing in New York's Escrow Statute required a manufacturer to obtain another state's approval for that price increase.  Id. at 66.  Significantly, the Court of Appeals noted that "[i]n Grand River, however, we suggested that a factfinder might be able to infer control from the fact that the allocable share release provision, which refunds payments made by NPMs in excess of what they would have paid as SPMs under the MSA, might effectively require NPMs to pay a 'national-market-share-dependent amount.'"  Id. at 67.  However, in light of the fact that MSA payments exceed escrow payments, New York's amended allocable share release provision

had never been applied, and therefore "the district court was
hardly compelled to conclude that NPM escrow payments will
actually be released from the state escrow fund in amounts
calculated by reference to national market share."  Id.  In the
end, the Court of Appeals found that Freedom Holdings' dormant
Commerce Clause challenge amounted to little more than
allegations of an unobjectionable upstream pricing impact.  Id.

### a.   Defendants' Motion for Summary Judgment

Defendants move for summary judgment on the dormant
Commerce Clause claim on two grounds.  First, the States argue
that their Escrow Statutes do not operate extraterritorially
because they apply solely to an NPM's in-state sales; therefore,
nothing in the Escrow Statutes creates an inference of price
control.  The Court considers New York's Escrow Statute as a
representative example of the state statutes at issue (excepting
Missouri's, which is addressed separately below).  New York
requires an NPM to place into escrow $.0188482 per unit sold.
N.Y. Pub. Health Law § 1399-pp.  "'Units sold' means the number
of individual cigarettes sold in the state by the applicable
tobacco product manufacturer (whether directly or through a
distributor, retailer or similar intermediary or intermediaries)
during the year in question, as measured by excise taxes
collected by the state on packs bearing the excise tax stamp of
the state."  Id. § 1399-oo(10) (emphasis added).  By definition,

the escrow obligation is based on an NPM's in-state cigarette
sales, if any; an NPM's out-of-state and nationwide sales have
no effect on its initial escrow payment, before any allocable
share release.  Cf. Grand River Enters. Six Nations, Ltd. v.
Beebe, 574 F.3d at 944 ("[T]he Allocable Share Amendment at
issue here is not based on cigarette sales outside of Arkansas.
NPM escrow payments are entirely a function of an NPM's sales in
Arkansas.  The payments are not based on nationwide sales.");
Star Scientific, Inc. v. Beales, 278 F.3d 339, 356 (4th Cir.
2002) ("Thus, rather than regulate 'upstream transactions'
outside of the State, the Virginia [escrow] statute imposes a
fee only for cigarettes actually sold within the State.  It has
no effect on transactions undertaken by out-of-state
distributors in other States.").

    The Second Circuit previously accepted Plaintiff's
allegation that the allocable share release provisions might
require an NPM to pay a "national-market-share-dependent
amount."  However, the record evidence does not bear out this
contention.  Under New York's Escrow Statute, for example, an
NPM is entitled to a refund of any escrow payments "on account
of units sold" in New York exceeding "the master settlement
agreement payments . . . that such manufacturer would have been
required to make on account of such units sold had it been a
participating manufacturer."  N.Y. Pub. Health Law § 1399-

pp(2)(b)(ii).  In other words, an NPM's escrow payments are
capped by its theoretical MSA payments if it joined the MSA as a
non-grandfathered SPM.  It is true that the calculation of the
theoretical MSA payment does take into account a manufacturer's
nationwide sales.  However, the undisputed evidence in the
record shows that non-grandfathered SPM payments under the MSA
(the amount an NPM would pay if it joined the MSA today) are
greater than NPM escrow payments.  Since there is no evidence
that an NPM's escrow payments have exceeded or will exceed the
cap, there is no refund under the amended allocable share
release provision.  This means that an NPM's actual net escrow
payment is simply the number of cigarettes sold in-state times
$.0188482, an amount that is in no way tied to a national-
market-share-dependent MSA payment.  In reality, an NPM's escrow
payments are determined solely on the basis of in-state sales,
and therefore, there is nothing in the Escrow Statutes from
which the Court can infer extraterritorial price control.

     Plaintiff's evidence is not to the contrary.  First,
Plaintiff points to Dr. Bulow's opinion that

> The requirements of the MSA and its legislation
> operate "extraterritorially" in that they create a
> regulatory payment scheme in each Settling State that
> uses national-market-share-dependent formulas to
> derive regulatory payments due each State.  That is,
> the regulatory scheme in each Settling State is not
> tied to commercial activity in that State but, rather,
> commercial activity nationwide, i.e., the national

> market shares and sales volume of the respective
> tobacco product manufacturers being regulated.

(Bulow Rep. at 2) (emphasis in original).  But this is nothing more than a recitation of the "possible" claim recognized by the Second Circuit in an expert's words.  Dr. Bulow provides no supporting data from which the Court can conclude that any NPM has in fact received an escrow refund under an amended allocable share release provision based on its nationwide cigarette sales. Moreover, Plaintiff conveniently dissects the expert's conclusion from his supporting analysis, which actually concerns OPM and SPM MSA payments, not escrow payments by NPMs.  Dr. Bulow opines that the MSA operates extraterritorially not because of the allocable share release provision in the Escrow Statutes, but because "the MSA requires a payment to be made to California based on a quantity of cigarettes manufactured in Virginia and sold in Tennessee" and because there is no defined relationship between a state's per capita cigarette sales and its allocable share of MSA payments.  (Id. at 7).  Dr. Bulow's analysis does not respond to Defendants' summary judgment argument, and therefore does not create an issue of material fact.

Plaintiff additionally cites two 2003 documents authored by the National Association of Attorneys General ("NAAG") urging the Settling States to amend the allocable share provision in

their Escrow Statutes.  Nothing in these documents indicates
that any one state controls prices in another; instead, NAAG is
simply pointing out that passing and enforcing escrow
legislation is in each state's best interest because it ensures
the existence of a settlement fund from with the state can be
reimbursed for health care costs.  The documents do not concern
pricing at all.

In the end, even if the Escrow Statutes' indirect reference
to national market share could implicate the dormant Commerce
Clause, there is no evidence that their practical effect is to
control prices by linking escrow payments to out-of-state sales.
This finding confirms the Second Circuit's ruling in Freedom
Holdings, 624 F.3d at 67, as well as one by the district court
in Kansas, which rejected a similar Commerce Clause challenge to
Kansas' Escrow Statute on summary judgment:

> Thus, contrary to what the Second Circuit posed as a
> "possibility" in Grand River, the amount which an NPM
> is required to pay into escrow in Kansas – or any
> other Settling State with a similar statute – is in no
> way "keyed" to a "national-market-share dependent
> amount."  Instead, it is keyed to the MSA payment
> which an SPM would have been required to make on
> account of the cigarettes sold in Kansas.  The base
> SPM per-cigarette payment is always higher than the
> statutory per-cigarette escrow amount for NPMs.
> Therefore, absent some adjustment which reduces the
> payment amount below the SPM base amount, the NPM
> escrow obligation in Kansas is determined solely on
> the basis of the payment amount set forth in the
> Escrow Statute, multiplied by the number of cigarettes
> which the NPM sells in Kansas.  What takes place in
> other states has no bearing on this calculation.

Int'l Tobacco Partners, Ltd. v. Kline, 475 F. Supp. 2d 1078, 1090-91 (D. Kan. 2007).

Second, the States move for summary judgment because there is no direct evidence that the Escrow Statutes cause the "short circuiting of normal pricing decisions" discussed in Healy. Nothing in one state's Escrow Statute creates a floor or ceiling for the price an NPM can charge in another state.  The undisputed deposition testimony in this case shows that Grand River and its distributors retain pricing authority; neither state legislation nor competitor price changes affect Grand River's pricing decisions.  Indeed, Tobaccoville can sell Seneca brand cigarettes at a loss to build market share in Tennessee without having to lower its price in Georgia or North Carolina. Similarly, nothing in any of the Escrow Statutes prevents an NPM from raising its prices in a given state to cover escrow payments imposed by that state's legislation.  See Freedom Holdings, 624 F.3d at 66 ("Unlike the statute struck down in Healy, however, nothing prevents manufacturers from recouping increased costs imposed by New York laws from New York consumers.").

Plaintiff seems to be arguing that the imposition of identical per-cigarette escrow costs in the forty-six Settling States promotes regulatory gridlock.  It again cites to Dr.

Bulow, who opines that the States require "per carton payments that are exactly the same, because the purpose is to protect an extraterritorial set of payments or taxes." (Bulow Rep. at 17). As an initial matter, Plaintiff does not identify any provision in the Escrow Statutes requiring an NPM to obtain one state's regulatory approval before selling in another state. Dr. Bulow's speculation about the States' motivation in passing their Escrow Statutes is little more than ipse dixit, and, moreover, does not raise a genuine issue of material fact with respect to price control, which is the basis of this dormant Commerce Clause claim. To be sure, New York and North Carolina's Escrow Statutes, for example, make each cigarette sold in-state $.0188482 more expensive, but it does not follow that New York sets the price of cigarettes sold in North Carolina. As the Second Circuit noted in Freedom Holdings, interstate price control "is not evidenced simply by coincident obligations which may produce parallel prices increases among the states." 624 F.3d at 67. A careful review of the record evidence reveals that the Escrow Statutes do not operate extraterritorially, and even if, as the Circuit recognized, the amount of an escrow refund is keyed to the amount an NPM would have paid if it joined the MSA as an SPM, a national-market-share-dependent amount, Defendants have shown that this scheme does not result in interstate price control. Defendants' motion

58

for summary judgment on the dormant Commerce Clause claim is
granted.

### b.    Plaintiff's Motion for Summary Judgment

On appeal, the Second Circuit found that Plaintiff had
stated a possible Commerce Clause claim based on the allegation
that "the practical effect of the challenged statutes and the
MSA is to control prices outside of the enacting states by tying
both the SPM settlement and NPM escrow payments to national
market share, which in turn affects interstate pricing
decisions." Grand River, 425 F.3d at 173.  Plaintiff advances
two arguments in support of its cross motion for summary
judgment on the Commerce Clause claim:  (1) a veto provision in
the MSA allows a single Settling State to determine whether an
NPM can become an SPM, thereby regulating commerce in any state
that would allow the NPM to join; and (2) Missouri's Escrow
Statute imposes escrow obligations based on commerce that takes
place in other states.  It is questionable whether either of
these theories advances the price control claim the Second
Circuit remanded, but the Court will address them in turn.

### i.    Veto Power

Plaintiff filed an amended complaint to amplify its
remaining Sherman Act and Commerce Clause claims on March 27,
2008.  The amended complaint pleads no facts establishing any
state's ability to veto an NPM's MSA application, nor does the

complaint reference any provision in the MSA setting forth such power.  Instead, Plaintiff now raises a Commerce Clause challenge to the MSA based on information gleaned from a May 13, 2008 deposition of the director and chief counsel of NAAG's Tobacco Project.  Specifically, Peter Levin of NAAG testified that after reviewing an NPM's MSA application, the Settling States will "collectively" decide whether or not they wish to settle with the NPM.  (Violi Decl., Ex. H, Deposition of Peter J. Levin at 180).  From this single piece of testimony, Plaintiff extrapolates a dormant Commerce Clause claim, namely that by allowing one state to veto an NPM's entry into the MSA, that state is regulating commerce in the other forty-five Settling States by forcing the manufacturer to sell as an NPM instead of an SPM.

First and foremost, there were no facts supporting this veto power claim pleaded in the complaint, and therefore, it is not properly raised on summary judgment.  Post-remand by the Second Circuit, the only possible dormant Commerce Clause challenge to the MSA (if any challenge to the MSA separate and apart from the Escrow Statutes survived at all) is that the MSA controls prices outside of a Settling State by tying SPM settlement payments to national market share.  See Grand River, 425 F.3d at 173. Plaintiff has apparently abandoned that price control claim.

Even if the veto power were well-pleaded, Plaintiff has not adduced any evidence in support of its motion for summary judgment.  There is no evidence that any Settling State has attempted or has successfully vetoed an NPM's entry into the MSA.  Grand River's own MSA application was rejected due to its unwillingness to comply with the MSA's terms, specifically Section XVIII(1).  See Grand River, 2006 WL 1517603, at *7. Furthermore, there is no evidence that this hypothetical veto power has any affect on commerce in the Settling States.  If, for example, every Settling State except New York wanted to settle with an NPM but New York blocked its entry into the MSA, the manufacturer could simply continue selling in any Settling State, with lower costs and likely at a lower price, as an NPM. There is certainly no evidence that the necessity of collective agreement among the States to settle impermissibly affects commerce, much less cigarette prices, at all.

### ii.    Missouri's Escrow Statute

Missouri is the only state that has not amended the allocable share release provision of its Escrow Statute.  In Missouri, an NPM is entitled to a refund of any escrow payments made in excess of Missouri's "allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement . . . had it been a participating manufacturer."  Mo. Ann. Stat. §

196.1003(b)(2)(B).  Plaintiff offers the following hypothetical
to illustrate the extraterritorial reach of Missouri's Escrow
Statute:  if an SPM's MSA payment is $5 per carton of cigarettes
and Missouri's allocable share of MSA payments is 1%, then an
NPM selling 10,000 cartons only in Missouri would be entitled to
a refund of any escrow payments over $500; however, if the NPM
sold 10,000 cartons in Missouri and 10,000 cartons in New York,
it would only be entitled to a refund of Missouri escrow
payments over $1,000.  Therefore, Plaintiff argues that an NPM
selling in Missouri[10] and another Settling State is required to
make additional escrow deposits in Missouri based on out-of-
state sales.

Missouri's allocable share release provision provides an
NPM with the ability to obtain an escrow refund that is likely
impossible in every other Settling State.  Despite the fact that
Missouri's escrow requirements are in part keyed to national
sales, an NPM's escrow obligation in Missouri is substantially
less than in the other Settling States.  Thus, any effect on
cigarette prices caused by Missouri's allocable share release
would inure to the NPM's benefit; it is quite a leap to infer
that Missouri's Escrow Statute leads to interstate price
control.  Plaintiff itself has argued that the Escrow Statutes

---

[10] There is no evidence that Grand River or its distributors has
ever sold any Grand River cigarettes in Missouri.

as originally enacted (such as Missouri's current Escrow
Statute) allowed it to "offer meaningful price competition to
Participating Manufacturers that had joined the MSA" – even
grandfathered SPMs.  Leung Decl., Ex. C, Plaintiff's Proposed
Findings of Fact in Support of Temporary Restraining Order and
Preliminary Injunction, at ¶ 26.  In fact, all of the record
evidence indicates that NPMs incur lower escrow costs in
Missouri than they do in other Settling States, and escrow
significantly less than OPMs and SPMs pay in MSA settlement
costs.  The reduction in costs afforded by Missouri's allocable
share release provision creates an opportunity for price
competition as opposed to price control.

There is no evidence that the practical effect of either
the MSA veto provision or Missouri's Escrow Statute is to
control interstate cigarette prices.  Plaintiff's motion for
summary judgment on its dormant Commerce Claim is denied.

## 2.   Foreign Commerce Clause

Finally, Plaintiff moves for summary judgment on its
Commerce Clause claim on the grounds that the Escrow Statutes
regulate Canadian commerce.  State regulation or taxation of an
activity that has "a substantial nexus with the taxing State, is
fairly apportioned, does not discriminate against interstate
commerce, and is fairly related to the services provided by the
State," does not burden interstate commerce in violation of the

Commerce Clause.  _Complete Auto Transit, Inc. v. Brady_, 430 U.S. 274, 279 (1977).  However, "an inquiry more elaborate than that mandated by _Complete Auto_ is necessary when a State seeks to tax the instrumentalities of foreign, rather than of interstate, commerce.  In addition to answering the nexus, apportionment, and nondiscrimination questions posed in _Complete Auto_, the court must also inquire, first, whether the tax, notwithstanding apportionment, creates a substantial risk of international multiple taxation, and, second, whether the tax prevents the Federal Government from 'speaking with one voice when regulating commercial relations with foreign governments.'"  _Japan Line, Ltd. v. Los Angeles County_, 441 U.S 434, 451 (1979).  In its motion for summary judgment, Plaintiff makes two separate but related arguments that the Court refers to as the Foreign Commerce Claim.  First, Plaintiff argues that it is a Canadian company that conducts no business in, and therefore lacks a substantial nexus to, the United States as required by _Complete Auto_ and _Japan Line_.  Second, Plaintiff contends that the Escrow Statutes impermissibly regulate foreign commerce by requiring Grand River to make per-cigarette escrow payments based on Seneca brand cigarettes that are sold in-state by third party importers/distributors, as the sale of cigarettes from Grand River to its distributors takes place in Canada.

64

Plaintiff previously argued that the Escrow Statutes violated the Foreign Commerce Clause because their regulation of Grand River, a Canadian company, is inconsistent with a trade initiative between the United States and Colombia that removes duties on tobacco imports in exchange for replacing coca crops with tobacco crops.  This Court dismissed the Foreign Commerce Clause challenge pursuant to Rule 12(b)(6), see Grand River, 2003 WL 22232974, at *12, and entered final judgment on the claim.  Grand River, 2004 WL 2480433, at *3.

On appeal, Plaintiff abandoned the Colombian trade initiative argument in favor of the exact argument it now attempts to revive.  Specifically, Plaintiff contended:

> Independent of [the claim that the Escrow Statutes tie payments to national market shares], an Escrow Statute directly regulates commerce occurring entirely outside the enacting State's borders because it applies to an NPM even if the NPM conducts no business nor effects any sale in the subject State.  Specifically, Grand River sells no products within the jurisdiction of any MSA State.  Indeed, no matter where (be it in Canada or overseas) or to whom Grand River sells its products, it is assessed under an Escrow Statute if it "intends" that the products be sold "in the United States" and the products are subsequently sold in an MSA State – even by independent entities with which Grand River has had no dealings.  Defendants' enforcement and application of the Escrow Statutes to Grand River simply because its products are sold in an MSA State constitutes an impermissible, extraterritorial reach and application of the Escrow Statute to out-of-state entities and transactions. Quill Corp. v. North Dakota, 504 U.S. 298, 311 (1992) (State's taxation of supplier whose only nexus with State is mail order sales violates Commerce Clause; mail order sales do not constitute sufficient nexus

with State to sustain regulation or taxation of out-
of-state sellers).

(Leung Decl. Ex. B, Brief of Plaintiff-Appellant at 42-43, Grand
River Enterprises Six Nations, Ltd. v. Pryor, 425 F.3d 158 (2d
Cir. 2005) (No. 03-9179)).   The Court of Appeals did not
explicitly address the foreign commerce aspect of the Commerce
Clause claim in its opinion, but unambiguously concluded that
"[w]e have carefully considered appellants' other arguments and
find them to be without merit."   Grand River, 425 F.3d at 175.

     Following remand, this Court granted Plaintiff's Rule 15(a)
motion to amend the complaint "to the extent the proposed
amendments relate to its surviving Sherman Act and Commerce
Clause claims."   Grand River Enters. Six Nations v. Pryor, No.
02 Civ. 5068, slip op. at 1 (S.D.N.Y. Mar. 17, 2008).   The
opinion made clear that no amendment relating to theories of
liability dismissed by the Court of Appeals would be allowed.
The Court of Appeals, in turn, made clear that the only
surviving basis of the Commerce Clause claim was that "the
practical effect of the challenged statutes and the MSA is to
control prices outside of the enacting states by tying both the
SPM settlement and NPM escrow payments to national market share,
which in turn affects interstate pricing decisions."   Grand
River, 425 F.3d at 173.   Having failed to persuade the Court of
Appeals of the merit of this argument, any attempt by Plaintiff

66

to replead a claim premised on the regulation of Canadian commerce was improper; consequently, there is no Foreign Commerce Clause claim for the Court's consideration on this motion.

### C.    Collateral Estoppel

For unspecified reasons, Plaintiff has separately pursued Sherman Act and Commerce Clause challenges to the MSA and Escrow Statute against the Arkansas Attorney General in the Western District of Arkansas.  The district court dismissed all of Plaintiff's claims, and the Eighth Circuit affirmed.  See <u>Grand River Enters. Six Nations, Ltd. v. Beebe</u>, 418 F. Supp. 2d 1082 (W.D. Ark. 2006), <u>aff'd</u>, 574 F.3d 929 (8th Cir. 2009).  The Defendant States argue that the doctrine of collateral estoppel bars Plaintiff from pursuing identical claims in Arkansas and New York.  Having independently determined that Defendants are entitled to summary judgment on both the Sherman Act and Commerce Clause claims, the Court need not decide whether the Eighth Circuit's dismissal of identical challenges to the MSA and Arkansas' Escrow and Contraband Statutes precludes Plaintiff's claims in this action.

### IV.    Conclusion

To the extent resolution of the evidentiary motions is required, the motion to exclude Dr. Eisenstadt's and Dr. Bulow's expert reports is denied.  Having reviewed all of the evidence

proffered in support of its claims, the Court holds that
Plaintiff's motion for summary judgment on the Commerce Clause
and Sherman Act claims is denied in all respects.  The States'
motion for summary judgment on the Commerce Clause and Sherman
Act preemption claims is granted.  Any and all Sherman Act
violation claims are foreclosed on the basis of state action
immunity.

Decision on these motions (Docket Nos. 305 and 306)
resolves all of the claims in the amended complaint.  The Clerk
of Court is directed to close this case.

**SO ORDERED.**

Dated:      New York, New York
            March 17, 2011

John F. Keenan
United States District Judge