UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------X
GRAND RIVER ENTERPRISES SIX    :
NATIONS, LTD.,                 :
                               :
                Plaintiff,     :       No. 02 Civ. 5068 (JFK)
                               :       **Opinion and Order**
       -against-               :
                               :
TROY KING et al.,              :
                               :
                Defendants.    :
-----------------------------X
APPEARANCES:

        For Plaintiff:
            Leonard Violi, Esq.

            Robert Luddy, Esq.
            WINDELS MARX LANE & MITTENDORF, LLP

            Marvin Lange, Esq.
            Marc Mukasey, Esq.
            BRACEWELL & GIULIANI, LLP

        Liaison Counsel for Defendants:
            Office of the Attorney General of the State New York
                Of Counsel:  Christopher Leung, Esq.
                             Dana Biberman, Esq.

**JOHN F. KEENAN, United States District Judge:**

        Before the Court is Plaintiff Grand River Enterprises Six

Nations, Ltd.'s ("Grand River" or "Plaintiff") motion to amend

the March 22, 2011 judgment dismissing its Sherman Act and

Commerce Clause claims against the Attorneys General of Alabama,

Alaska, Arizona, California, Colorado, Delaware, Georgia, Idaho,

Illinois, Indiana, Iowa, Kansas, Louisiana, Maine, Maryland,

Massachusetts, Michigan, Missouri, Montana, Nebraska, New York,

North Carolina, Ohio, Oregon, South Carolina, South Dakota, Tennessee, Washington, Wisconsin, and Wyoming (collectively, the "States" or "Defendants").[1]  For the reasons that follow, the motion is denied.

## I.   Background

Briefly, in 1998, the nation's four largest tobacco companies negotiated an agreement known as the tobacco Master Settlement Agreement ("MSA") with forty-six states and certain other jurisdictions settling pending and future claims in exchange for annual payments by the cigarette companies to compensate the states for health care costs associated with the treatment of tobacco-related illnesses.  The first four tobacco company signatories are known as the original participating manufacturers ("OPMs").  Other tobacco manufacturers may elect to participate in the MSA at any time and be released from liability; these are known as subsequent participating manufacturers ("SPMs").  Some manufacturers continue to sell cigarettes in the United States without joining the MSA; these are referred to as non-participating manufacturers ("NPMs"). Unlike OPMs and SPMs, NPMs do not make MSA settlement payments to the States; therefore, the States enacted Escrow and

---

[1] Subsequent to the March 17, 2011 opinion and order granting summary judgment in favor of the States, Grand River entered into stipulations of dismissal with prejudice with the Attorneys General of Colorado, Delaware, Illinois, Ohio, Oregon, and Wyoming.

Contraband Statutes requiring NPMs that sell cigarettes in-state either to:  (1) join the MSA and make settlement payments; or (2) pay a specified amount per cigarette sold in-state into an escrow fund used to satisfy any judgment the state should win against the NPM.

Grand River filed its initial complaint in 2002, alleging that the MSA and its implementing legislation violated the dormant Commerce Clause, the Foreign Commerce Clause, the Indian Commerce Clause, the Sherman Act, the Equal Protection Clause, the Due Process Clause, the First Amendment, 42 U.S.C. § 1983, and that the MSA was preempted by the Federal Cigarette Labeling and Advertising Act.  After several years of litigation, Grand River's claims were winnowed down to the alleged dormant Commerce Clause and Sherman Act violations.  See, e.g., Grand River Enters. Six Nations, Ltd. v. Pryor, 425 F.3d 158 (2d Cir. 2005) (affirming dismissal of Indian Commerce Clause, due process, and equal protection claims and remanding for further proceedings on dormant Commerce Clause claim); Grand River Enters. Six Nations, Ltd. v. Pryor, No. 02 Civ. 5068, 2006 WL 1517603 (S.D.N.Y. May 31, 2006) (denying Grand River's application for a preliminary injunction barring the States from enforcing the amended allocable share provisions of their Escrow Statutes), aff'd, 481 F.3d 60 (2d Cir. 2007) (per curiam).  In an opinion and order dated March 17, 2011, the Court granted

summary judgment in favor of the States on both the Sherman Act and Commerce Clause claims, finding, in relevant part, that: (1) Grand River does not have standing to challenge the MSA, as it has suffered no antitrust injury flowing from the agreement itself; (2) the MSA, as implemented by the States' Escrow and Contraband Statutes, is not a per se violation of § 1 of the Sherman Act; (3) the Escrow and Contraband Statutes do not mandate or authorize a per se violation of the Sherman Act such that they are preempted by the federal law; and (4) Parker state action immunity independently protects the States from any potential Sherman Act liability.  See Grand River Enters. Six Nations, Ltd. v. King, 783 F. Supp. 2d 516, 529-39 (S.D.N.Y. 2011).

Grand River now moves pursuant to Rules 52(b) and 59(e) of the Federal Rules of Civil Procedure to vacate those portions of the March 17, 2011 opinion and order and the accompanying judgment that granted the States summary judgment on the Sherman Act so the claim can proceed to trial.  Grand River contends that documents it acquired long after discovery in this case had closed would have materially influenced the Court's findings had they been part of the summary judgment record.  First, Grand River submits a series of January and February 2011 emails in which officials in the Nebraska Attorney General's Office circulated draft amendments to Nebraska's Escrow Statute to

attorneys representing certain OPMs.  (Declaration of Gregory J.

Kerr ("Kerr Decl."), Ex. D).  In response, the tobacco lawyers

offered proposed edits to the draft amendments.  (Id.)

Additionally, Grand River cites to an arbitration brief New York

State submitted in proceedings relating to the NPM Adjustment

for 2003 as evidence that the MSA is a contract between the OPMs

and the States requiring the States to enact Escrow Statutes

that impose costs on NPMs.  (Kerr Decl., Ex. E).

## II.    Discussion

Rule 52(b) of the Federal Rules of Civil Procedure provides

that the district court "may amend its findings – or make

additional findings – and may amend the judgment accordingly."

Initially, there is some question about whether Rule 52, which

contemplates amendment of findings made by the court in a

nonjury trial, is an appropriate vehicle for reconsideration of

a summary judgment decision.  See, e.g., St. Paul Mercury Ins.

Co. v. Fair Grounds Corp., 123 F.3d 336, 339 (5th Cir. 1997);

Buck v. Libous, No. 02 Civ. 1142, 2005 WL 2033491, at *1 n.2

(N.D.N.Y. Aug. 17, 2005) ("Since a court engages in no fact-

finding when it decides a summary judgment motion, a party may

not use a Rule 52(b) motion to seek reconsideration of such a

decision."); see also U.S. v. Local 1804-1, Int'l Longshoremen's

Ass'n, 831 F. Supp. 167, 169 (S.D.N.Y. 1993), aff'd sub nom.

U.S. v. Carson, 52 F.3d 1173 (2d Cir. 1995) ("The purpose of

post-judgment motions under Rule 52(b) is to give the district court an opportunity to correct manifest errors of law or fact at trial, or in some limited situations, to present newly discovered evidence." (emphasis added)).  Therefore, the Court considers Plaintiff's motion pursuant to its alternate ground for relief – Rule 59(e).

"While there are no formal guidelines, courts have recognized four basic grounds on which a judgment may be altered or amended pursuant to Rule 59(e):  the need to prevent manifest injustice, the need to correct errors of law or fact, the availability of new evidence, or an intervening change in controlling law."  D'Amico Dry Ltd. v. Primera Maritime (Hellas) Ltd., No. 09 Civ. 7840, 2011 WL 3273208, at *2 (S.D.N.Y. Aug. 1, 2011) (citing Virgin Atlantic Airways, Ltd. v. Nat'l Mediation Bd., 956 F.2d 1245, 1255 (2d Cir. 1992)).  As construed, Rule 59(e) substantially overlaps with Rule 60(b), which allows the court to relieve a party from a final judgment on grounds such as mistake, fraud, and "newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b)."  Fed. R. Civ. P. 60(b)(2).  "Whether relief is sought under Rule 59(e) or Rule 60(b)(2), courts apply the same strict standard for determining what qualifies as 'newly discovered evidence.'"  Becnel v. Deutsche Bank AG, No. 11 Civ. 1615, 2011 WL 6599229, at *2

(S.D.N.Y. Dec. 21, 2011).  Accordingly, reconsideration is
warranted only if the moving party demonstrates that:  "(1) the
newly discovered evidence was of facts that existed at the time
of trial or other dispositive proceeding, (2) the movant must
have been justifiably ignorant of them despite due diligence,
(3) the evidence must be admissible and of such importance that
it probably would have changed the outcome, and (4) the evidence
must not be merely cumulative or impeaching."  <u>U.S. v. Int'l
Bhd. of Teamsters</u>, 247 F.3d 370, 392 (2d Cir. 2001) (internal
quotation omitted).

###     A.    The Nebraska Emails and New York State Brief

On February 24, 2011, the law firm of Fredericks Peebles &
Morgan LLP, which does not represent Plaintiff in this action,
submitted a public records request to the Office of the Attorney
General of Nebraska seeking correspondence between the state and
three tobacco companies regarding proposed amendments to
Nebraska's Escrow Statute.  (Kerr Decl., Ex. C at 2).  On April
5, 2011, after entry of final judgment in this case, the
Nebraska Attorney General's Office responded to the request; the
Fredericks firm shared the documents provided with Plaintiff's
counsel on April 8, 2011.  (Kerr Decl. ¶ 4).  The documents
include:  (1) a January 20, 2011 email in which the Chief Deputy
Attorney General of Nebraska sent draft legislation to various
tobacco attorneys, noting that "[w]e would be interested in your

thoughts" (Kerr Decl., Ex. D at 1); and (2) a follow-up email regarding "Nebraska's efforts to implement the model legislation contemplated during settlement negotiations" in which the Attorney General's Office stated that it would "welcome your comments and suggestions as to the sufficiency of these legislative revisions." (Kerr Decl., Ex. D at 5). In a response dated February 16, 2011, one OPM attorney submitted a "proposed mark-up of the bill." (Kerr Decl., Ex. D at 13). Unsurprisingly, the OPM attorney noted that if Nebraska's intent was not to implement the Model Bill, the OPMs took the position that certain obligations the model legislation imposed on all tobacco manufacturers should only apply to NPMs. (Id.).

Similarly, on April 7, 2011, Cory Albright, an attorney for the Seneca Nation of Indians who does not represent Plaintiff in this action, sent Plaintiff's counsel a copy of a brief[2] the State of New York submitted in connection with an NPM Adjustment proceeding; the brief was part of the record in a case Mr. Albright and the Seneca Nation appealed to the United States Court of Appeals for the Second Circuit. (Kerr Decl. ¶ 5). In the brief, New York State sets forth its opposition to an

---

[2] The document itself is undated. Plaintiff believes that the brief was submitted in May 2010, (Kerr Decl. ¶ 5), while the States put the date closer to July 2010. (Declaration of Christopher K. Leung ¶ 2). In either case, the brief was created after the summary judgment motions were submitted to this Court.

application by OPMs and SPMs for a refund of MSA settlement
payments those tobacco companies made to the States in 2003.
(Kerr Decl., Ex. E).  In it, New York analogizes the OPMs and
SPMs' refund request to a breach of contract claim; Plaintiff
cites to this language as evidence that the MSA is a contract
between the OPMs, SPMs, and the States obligating the States to
enact Escrow Statutes.  Plaintiff contends that these documents
are evidence that the Escrow Statutes were enacted not by
unilateral state action but instead at the behest of the OPMs.

### 1.   Plaintiff Has Not Established Justifiable Ignorance

None of this evidence is "newly discovered" such that
reconsideration of the summary judgment decision is warranted.
Assuming without deciding that these documents concern facts
that existed at a time when they could have impacted the summary
judgment motions, Plaintiff has not shown that it was
justifiably ignorant of the evidence.  The Nebraska emails were
created prior to entry of final judgment, were publicly
accessible, and could have been obtained, free of charge, (Kerr
Decl., Ex. C at 2), had Plaintiff requested them from the
Attorney General's Office.  Moreover, Plaintiff asks the Court
to infer from the Nebraska emails that the OPMs were involved in
drafting amended Escrow Statutes in numerous other states, yet
Plaintiff made no attempt to secure public records with which to
supplement the summary judgment record from any state, including

Nebraska.  Similarly, Plaintiff offers no explanation for why it was unaware of the New York brief, despite the fact that the brief pre-dates the entry of final judgment by at least eight months and was part of an appellate record which can be publicly viewed online through the Second Circuit's PACER system for a small fee.  Plaintiff is the beneficiary of other attorneys' efforts, but the fact that the Fredericks firm and Mr. Albright did not share otherwise available documents with Plaintiff until after final judgment was entered in this case in no way establishes justifiable ignorance or due diligence on Plaintiff's part.

**2.   "New" Evidence Would Not Change Any Sherman Act Findings**

More importantly, the Nebraska emails and New York brief do not raise any factual issues necessitating reconsideration of the Court's dismissal of the Sherman Act claim.  Plaintiff argues that the OPM attorney's proposed edits to Nebraska's Escrow Statute evidence a direct link between the OPMs and the Escrow Statutes which impose costs on NPMs; on the basis of the Nebraska emails, Plaintiff contends that the States have ceded responsibility for drafting Escrow Statutes to OPMs.  Plaintiff further claims that the New York brief demonstrates a contractual relationship between the States and OPMs requiring the States to enact Escrow Statutes that meet with OPMs' approval.  In other words, Plaintiff is attempting to revive its

10

theory that NPM escrow costs imposed by Escrow Statutes are a product of the MSA, and not, as the Court previously found, a product of unilateral state action.

First, the newly submitted documents have no effect on the Court's finding that Plaintiff does not have standing to challenge the MSA.  The Court previously held that Plaintiff did "not point to any [antitrust] injury occasioned by the MSA operating apart from its implementing legislation." Grand River, 783 F. Supp. 2d at 530.  However, recognizing the "interlocking nature of the MSA and Escrow and Contraband Statutes" – the exact argument Plaintiff is currently pressing - the Court went on to consider whether cost increases NPMs suffer as a result of escrow payments under the States' Escrow Statutes constituted an antitrust injury sufficient to confer standing. Id.  Thus, even if Plaintiff's new evidence conclusively established – and it does not - that the MSA is the sole source of NPMs' increased costs, the Court has already determined that:

> NPMs' increased costs, in the form of escrow payments, are still less than the MSA costs of OPMs, SPMs, and grandfathered SPMs selling in excess of their grandfathered share.  Any cost increases the MSA levies against NPMs are counterbalanced by the greater cost increases the OPMs and SPMs took upon themselves in the form of MSA settlement payments. . . .  In other words, the MSA provides NPMs with a competitive advantage even taking into account the cost-increasing escrow payments.  Even if the MSA is an agreement among competitors to raise rivals' costs, Plaintiff has not demonstrated an antitrust injury flowing from

this agreement, and therefore lacks standing to challenge the MSA directly.

Id. Plaintiff counters that if the OPMs and SPMs prevail in their effort to secure a refund of MSA settlement payments in the 2003 NPM Adjustment proceeding, their effective per-cigarette costs could be lower than NPM escrow costs. This is pure speculation as there is nothing in the New York brief suggesting either that the MSA settlement payment refund has occurred or will occur or that a refund would be in an amount large enough to reduce OPM MSA costs below NPM escrow costs. Thus, the Nebraska emails merely reiterate a point that Plaintiff previously sought to make and the Court previously rejected. The New York brief adds no new information regarding NPM costs or antitrust injury.

Similarly, the documents have no effect on the Court's determination that the MSA is not a per se violation of the Sherman Act. Plaintiff moved for summary judgment on a price-fixing theory that the MSA is an agreement among OPMs to raise rival NPMs' costs. However, the Court found no evidence of price fixing because "NPM escrow payments are on balance lower than OPM and SPM MSA payments, meaning that NPMs still enjoy a cost, and, in turn, a price advantage over their competitors." Id. at 532. Thus, even if the Court takes into account the Nebraska emails and New York brief, this evidence in no way

impacts the Court's findings with respect to differential costs. Regardless of whether escrow costs are directly attributable to the MSA or Escrow Statutes, the Court's finding that the "MSA's cost-increasing function, as implemented by the Escrow and Contraband Statutes, lacks the hallmark features of price fixing" stands.  Id.

If Plaintiff's "new" evidence has any relevance at all, it is with respect to the Court's determination that state action immunity protects the Escrow and Contraband Statutes from Sherman Act preemption.  As laid out in the summary judgment opinion, the test for Sherman Act preemption is two-fold. First, a state regulatory scheme may be preempted where it "mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." Rice v. Norman Williams Co., 458 U.S. 654, 661 (1982).  Second, the Court considers whether the state action immunity doctrine nonetheless immunizes the state from liability because (1) the restraint in question is "clearly articulated and affirmatively expressed as state policy," and (2) the policy is "actively supervised" by the state itself.  Cal. Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc., 445 U.S. 97, 105 (1980).  On summary judgment, the Court made a primary finding that

> the Escrow and Contraband Statutes are not a hybrid
> restraint of trade.  The statutes do not delegate any
> degree of private regulatory power to OPMs or SPMs.
> On their faces, the Escrow Statutes do nothing more
> than set a per-cigarette payment NPMs must make for
> each cigarette sold in the state. . . .  Statutory
> escrow payments are not defined by or tied to OPMs or
> SPMs.  This Court agrees with the Court of Appeals
> that the Escrow and Contraband Statutes are
> unilaterally imposed by government to the exclusion of
> private control.

Grand River, 783 F. Supp. 2d at 535 (internal quotation

omitted).  However, even if the Escrow and Contraband Statutes

did create a hybrid restraint, the Court went on to find that

the statutes do not mandate or authorize anticompetitive conduct

because "Plaintiff cannot identify any provision in the Escrow

and Contraband Statutes themselves that acts to enforce the

MSA's alleged output cartel.  The only function of the Escrow

and Contraband Statutes is to collect from each NPM a per-

cigarette fee.  These NPM cost increases do not transform the

legislation into a free pass for OPMs and SPMs to fix prices."

Id.  Alternatively, the Court found that state action immunity

saved the Escrow and Contraband Statutes from Sherman Act

preemption.  Id. at 537-38.

　　　Plaintiff now argues that OPM participation in drafting

Nebraska's amended Escrow Statute calls into question the

Court's finding that the Escrow and Contraband Statutes are the

product of unilateral state action.  That an OPM attorney

offered comments on the proposed legislation comes as no

surprise, as the Nebraska Attorney General's Office canvassed numerous constituents in developing Nebraska's amended Escrow Statute, including "the Department of Revenue, tobacco wholesalers, manufacturers, and the Indian tribes." (Declaration of Christopher K. Leung, Ex. B at 4).  Nebraska's solicitation of comments on its draft escrow legislation from a tobacco company does not change the fact that Nebraska's legislature must independently consider the final proposed escrow statute, debate its merits, and determine whether its enactment and enforcement is in the best interest of the state. To equate this level of private participation in the drafting of legislation with the complete delegation of regulatory authority is to fundamentally misconstrue our system of representative government.  Indeed, the Supreme Court's state action immunity jurisprudence recognizes that the Sherman Act does not preempt an anticompetitive act that "derived its authority and efficacy from the legislative command of the state," even where such legislation was proposed and approved by a private party. Parker v. Brown, 317 U.S. 341, 350, 352 (1943) ("It is the state which has created the machinery for establishing the prorate program.  Although the organization of a prorate zone is proposed by producers, and a prorate program, approved by the Commission, must also be approved by referendum of producers, it is the state, acting through the Commission, which adopts the

program and which enforces it with penal sanctions, in the
execution of a governmental policy."); cf. City of Columbia v.
Omni Outdoor Advertising, Inc., 499 U.S. 365, 375 (1991)
(rejecting conspiracy exception to state action immunity
doctrine, noting "[t]hese sentences should not be read to
suggest the general proposition that even governmental
regulatory action may be deemed private - and therefore subject
to antitrust liability - when it is taken pursuant to a
conspiracy with private parties.  The impracticality of such a
principle is evident if, for purposes of the exception,
'conspiracy' means nothing more than an agreement to impose the
regulation in question.  Since it is both inevitable and
desirable that public officials often agree to do what one or
another group of private citizens urges upon them, such an
exception would virtually swallow up the Parker rule:  All
anticompetitive regulation would be vulnerable to a 'conspiracy'
charge").

      The New York brief does not change this analysis.  Although
the brief analogizes the OPMs' and SPMs' request for a refund of
settlement payments to a breach of contract claim, nothing
therein states that the States must pass Escrow Statutes under
the terms of the MSA.  The New York brief does little more than
restate the terms of the MSA and confirm that the MSA contains
financial incentives for the States to pass Escrow Statutes.  It

does not suggest that the OPMs have co-opted various state legislatures such that the passage and implementation of the Escrow Statutes cannot be considered sovereign state acts.  Cf. Xcaliber Int'l Ltd. LLC v. Attorney Gen. of La., 612 F.3d 368, 378-79 (5th Cir. 2010) (rejecting argument that "the entire regulatory structure created by the MSA, its implementing legislation, and the [amended escrow statute] represents a private conspiracy enacted by the legislature at the behest of the OPMs," finding that "[a]lthough we recognize that Louisiana was under considerable financial pressure to pass [an amended escrow statute], we are extremely hesitant to embrace an argument that depends on our finding that the tobacco lobby captured the Louisiana legislature.  Although PMs may have lobbied in favor of passing the [amended escrow statute], it does not follow that the Louisiana legislature acted solely at their behest or that lobbying itself can be the basis of a Sherman Act violation").

    Critically, however, Plaintiff's reconsideration motion fails because it ignores the test for Sherman Act preemption – that is, a state regulatory scheme will be preempted only if it mandates or authorizes private parties to engage in anticompetitive behavior.  Although Plaintiff believes its "new" evidence raises factual issues with respect to the relationship between OPMs and the States, Plaintiff has not adduced any

17

additional evidence demonstrating that the Escrow and Contraband
Statutes mandate or authorize a _per se_ antitrust violation such
as price fixing.

Finally, Plaintiff suggests that the Nebraska emails
conflict with the Court's holding under _Midcal_ that the States
actively supervise enforcement of their Escrow Statutes.  As the
Court previously found no price fixing mechanism in the Escrow
and Contraband Statutes, the only aspect of the statutes that
requires active supervision is the collection of NPM escrow
payments.  _Grand River_, 783 F. Supp. 2d at 538.  The Court
cannot discern any logical explanation as to how Nebraska's
consideration of a constituent's legislative proposal indicates
that the States overall have failed to monitor collection of MSA
and escrow payments as required to meet _Midcal_'s active
supervision requirement.

### B.   Reply Evidence

In its reply memorandum of law, Plaintiff submitted three
additional new documents in support of its request for amendment
of the judgment with respect to the Sherman Act claim.  On April
12, 2011, the law firm of Lueben Johnson & Barnhouse LLP, which
does not represent Plaintiff in this action, sent a public
records request to the New Mexico Attorney General's Office
seeking correspondence between the state and OPMs or SPMs as
well as any briefs relating to an MSA arbitration in Chicago.

(Declaration of Gregory J. Kerr in Further Support ("Kerr Reply Decl."), Ex. A).  The Lueben firm later sent to Plaintiff's counsel:  (1) a July 11, 2002 document drafted by the National Association of Attorneys General entitled "Outline of Agenda for 'Refresher Course' on NPM Statute Enforcement" (Kerr Reply Decl., Ex. B); (2) a Spring 2003 draft report by the Virginia Department of Taxation (Kerr Reply Decl., Ex. C); and (3) the September 17, 2010 Brief of 15 States submitted in the 2003 NPM Adjustment proceedings (Kerr Reply Decl., Ex. D).  Plaintiff argues that these three additional documents are further evidence of the interrelated nature of the MSA and its implementing legislation.

These documents are not properly before the Court and will not be considered.  The Court does not countenance Plaintiff's efforts to sandbag the States with last minute documents when the States have no opportunity to respond.  See ABN Amro Verzekeringen BV v. Geologistics Americas, Inc., 485 F.3d 85, 97 n.12 (2d Cir. 2007) ("We decline to consider an argument raised for the first time in a reply brief.").  Moreover, the three additional documents suffer from the same defect as the Nebraska emails and the New York brief – they are simply not new evidence of which Plaintiff was justifiably ignorant despite the exercise of due diligence.  Plaintiff has offered no explanation as to why it did not or could not obtain the documents, all of which

19

pre-date entry of final judgment, through a public records request to the New Mexico Attorney General's Office prior to June 2011.  This case is nearing its tenth anniversary on the docket, with considerable appellate litigation still to come. The time for considering "new" documents has long since passed, and district court proceedings must come to a close if Plaintiff's claims are ever to be resolved.

### III.      Conclusion

Plaintiff's motion to amend the March 22, 2011 judgment pursuant to Rules 52(b) and 59(e) is denied.

**SO ORDERED.**

Dated:     New York, New York
           January 30, 2012

                              John F. Keenan
                      United States District Judge